PAUL R. RUBENSTEIN & others,[1] trustees, *vs.* ROYAL
INSURANCE COMPANY OF AMERICA.

No. 96-P-1650.

Suffolk. November 6, 1997. - May 27, 1998.

Present: PERRETTA, KASS, & GREENBERG, JJ.

Further appellate review granted, 428 Mass. 1109 (1998).

*Contract,* Insurance, Indemnity, Construction of contract. *Evidence,* Existence
of document. *Practice, Civil,* Burden of proof. *Hazardous Waste. Insur-
ance,* Coverage, Insurer's obligation to defend, Construction of policy,
Comprehensive liability insurance, Property damage, Owned property
exclusion, Alienated premises exclusion, Settlement of claim. *Damages,*
Attorney's fees. *Joint and Several Obligation. Environment,* Environmental
cleanup costs.

In a declaratory judgment action seeking to establish an insurer's duty to
defend and indemnify environmental damage claims, the evidence was suf-
ficient to prove, by a preponderance of the evidence, the existence and
terms of the policies in question. [845-847]

The complaint in a civil action, seeking a declaration that an insurer had a
duty to defend and indemnify, sufficiently alleged "property damage"
within the meaning of the policy in question to obligate the insurer to
defend, and the judge's indemnification award was reasonable and sup-
ported by the evidence. [847-852]

In the circumstances of a claim against an insurer for indemnification of the
costs of environmental contamination cleanup and defense, the judge did
not err in declining to apportion liability among all the insurers of the
property based on years of coverage, where the policy in question provided
indemnity for the insured's entire liability and where the property was
continuously being contaminated during the entire applicable policy period.
[852-853]

An owned property exclusion in a policy of liability insurance, barring cover-
age for damage to property owned or occupied by the insured, was inap-
plicable to environmental damage from a leaking oil tank that had migrated
beyond the boundaries of the site in question and posed an imminent or
immediate threat of additional contamination beyond the site. [853-854]

An alienated premises exclusion in a policy of liability insurance, barring
coverage for property damage to premises "alienated by the named
insured" and arising out of those premises, was inapplicable to

[1]Bennett B. Rubenstein, John B. Rubenstein, and Lee A. Rubenstein, all as
trustees of Security Mills Realty Trust.

environmental damage to that property and property of others caused by a leaking oil tank occurring during the policy period and before the insured sold the property. [854-855]

In a civil action brought against an insurer, the judge did not err in crediting against the insurer's liability monies received by the plaintiff in settlements from other insurers that were cumulative damages for the same wrong. [855-856]

An action in which the plaintiff established its insurer's duty to defend and indemnify was remanded for an assessment of attorney's fees in light of the decision in *Preferred Mut. Ins. Co.* v. *Gamache*, 426 Mass. 93, 95-96 (1997). [856]

CIVIL ACTION commenced in the Superior Court Department on March 22, 1990.

A jury-waived trial on the lost policy issue and motions for summary judgment were heard by *Margot Botsford*, J., and the case was tried before her.

*Alan B. Rubenstein* (*Donald R. Pinto, Jr.*, with him) for the plaintiffs.

*Molly H. Sherden* for the defendant.

*Laura A. Foggan & Daniel E. Troy*, of the District of Columbia, & *Rosanna Sattler*, for Insurance Environmental Litigation Association, amicus curiae, submitted a brief.

GREENBERG, J. During the demolition of former textile mill buildings in Newton, Security Mills Limited Partnership (SMLP) discovered leakage of number six fuel oil from an abandoned 15,000 gallon underground tank. To recover damages, the general partners of SMLP brought a civil action in April, 1989, against the trustees of Security Mills Realty Trust (trustees), from whom SMLP had purchased the property in 1985. The trustees in turn brought a declaratory judgment action against various insurance companies, seeking a declaration that the insurance companies had a duty to defend and indemnify the trustees in the SMLP action.

We summarize the facts, largely undisputed, from the judge's findings. The trustees owned property in Newton from 1922 to 1985. In 1985, the trustees sold the property to SMLP. In 1988, SMLP discovered that fuel oil had leaked out of an underground tank on the property, contaminating the soil surrounding the tank. SMLP brought a civil action against the trustees in April of 1989, seeking damages under G. L. c. 21E, §§ 4 & 5, and G. L. c. 93A, § 11.

During the time the trustees owned the property, they purchased insurance from six different insurance companies.[2] After the SMLP suit was filed, the trustees requested that each insurer assume defense of the suit. All of the insurers declined, except Wausau Underwriters Insurance Company (Wausau), which, under a reservation of rights, agreed to advance the trustees their legal fees and expenses in defending the SMLP suit up to a maximum of $150 per hour.

In March of 1990, the trustees filed a declaratory judgment action against Liberty Mutual Insurance Company (Liberty Mutual), Royal Insurance Company (Royal), Commercial Union Insurance Company (Commercial Union), Lumbermens Mutual Casualty Company (Lumbermens), and Continental Casualty Company (Continental), seeking a declaration that the named insurers had a duty to defend and indemnify the trustees in the SMLP suit. In June of 1991, the trustees settled the SMLP suit for $425,000. By the time of the settlement, Wausau had paid $261,902.84 in legal fees and expenses in defending the trustees in the SMLP suit. The trustees themselves paid $17,886.70 in legal fees and expenses, representing the amount charged to the trustees over the $150 per hour paid by Wausau.

In October of 1991, a judge of the Superior Court determined that Lumbermens had a duty to defend the trustees in the SMLP suit. Because none of the other insurers' policies had been located, the judge did not decide whether the other insurers had a similar duty. By December of 1993, the trustees had settled their claims against Liberty Mutual and Commercial Union, two of the so-called "lost policy" insurers. In addition, Continental had stipulated that it had in fact issued a policy to the trustees. Thus, only Royal disputed that it had issued policies to the trustees.

Following a jury-waived trial in December of 1993, the same judge concluded that Royal had issued policies to the trustees covering the period from 1969 to 1977, only one of which, policy 516688 (effective 1969-1972), did not include a pollution exclusion clause. In October of 1994, the same judge determined that under policy 516688, Royal had a duty to defend the trustees in the SMLP suit. In November of 1994, there was a jury trial, presided over by the same judge, to determine factual

[2]Continental Casualty Company, Liberty Mutual Insurance Company, Commercial Union Insurance Company, Lumbermens Mutual Casualty Company, Royal Insurance Company, and Wausau Underwriters Insurance Company.

issues that would govern resolution of the question whether Royal had a duty to indemnify the trustees in the SMLP suit. The judge then heard supplemental testimony on the trustees' claim to recover the unreimbursed defense costs (i.e., the $17,886.70 not paid by Wausau).

In a thirty-six page memorandum, the judge carefully worked her way through the issues. Based upon the jury's verdict, the judge found that the SMLP claims were covered under one of the four policies issued by Royal to the trustees and that Royal was obligated to indemnify the trustees for the full amount of the settlement payment to SMLP. However, she reduced the amount of Royal's indemnity obligation by the amount the trustees had received from the other settling insurers. She also found that the trustees were entitled to recover those defense costs not advanced by Wausau. Finally, she denied the trustees' motion for an award of attorney's fees and costs for prosecuting the declaratory judgment action.

The trustees appeal from so much of the judgment as allows reduction of Royal's indemnity obligation and the denial of attorney's fees. In its cross appeal Royal argues that the judge erred (1) in finding that the trustees had proven the existence and terms of the missing policy in question; (2) in concluding that Royal had a duty to defend; (3) in adopting an "exposure" trigger of coverage theory; (4) in failing to allocate damages among the various insurers and years of coverage; and (5) in failing to apply exclusions contained in the policy to bar the trustees' claims. We affirm the judgment except as to the denial of attorney's fees.

1. *Sufficiency of the evidence of the existence of the policy.* Royal steadfastly denied having issued any policies to the trustees and the trustees tried in vain to locate the policies in question. In December, 1993, the judge conducted a bench trial limited to that issue. In her memorandum of decision, she assumed, without deciding, that the trustees had the burden to prove the existence and contents of the missing policies by clear and convincing evidence. On that basis, she concluded that the trustees had demonstrated that Royal had issued four liability insurance policies to the trustees between October 30, 1969, and October 5, 1977, and that only one policy (516688), a three-year policy that expired on October 30, 1972, did not exclude pollution. On appeal, Royal argues that there was insufficient evidence to establish the existence and terms of that policy.

As a threshold matter, we consider whether something more than a preponderance of the evidence is required to determine the existence and contents of a lost or missing policy. Might the standard of proof be clear and convincing evidence? In three cases cited by Royal in support of its argument that the more stringent standard should prevail, there was a strong likelihood that fraud or wrongdoing existed. See *Coghlin* v. *White*, 273 Mass. 53, 55 (1930), quoting from *Newell* v. *Homer*, 120 Mass. 277, 280 (1876) (proof of contents of a will must be "strong, positive and free from doubt"); *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849, 870 n.10 (1975). For Federal cases that apply a higher burden of proof, see *Emons Indus. Inc.* v. *Liberty Mut. Fire Ins. Co.*, 545 F. Supp. 185, 188 (S.D.N.Y. 1982); *Boyce Thompson Inst. for Plant Research* v. *Insurance Co. of N. America*, 751 F. Supp. 1137, 1140 (S.D.N.Y. 1990). Contrast *Remington Arms Co.* v. *Liberty Mut. Ins. Co.*, 810 F. Supp. 1420, 1423-1426 (D. Del. 1992) (rejecting the clear and convincing test).

Generally the existence of an insurance policy is proven by documentary evidence. That a policy has been lost or destroyed does not mean that its existence and contents may not be reconstructed from business records, underwriter's folios, or billings of the insurance company to the insured. The evidence used to establish the existence and terms of the missing policies is in large part evidence in possession of the party against whom it is being offered. The more burdensome standard of proof of clear and convincing evidence ought not to be required.

Our view comports with other cases which disfavor a heightened standard of proof except in quasi criminal circumstances. See *Guardianship of Roe*, 383 Mass. 415, 422-423 (1981) (holding that a higher standard of proof is required when person will suffer stigma comparable to that of criminal conviction and face loss of liberty); *Medical Malpractice Joint Underwriting Assn. of Mass.* v. *Commissioner of Ins.*, 395 Mass. 43, 46 (1985) (holding that higher standard of proof is needed only "in a very limited number of cases where 'particularly important individual interests or rights are at stake' "). See also *Employers' Liab. Assur. Corp., Ltd.*, v. *Hoechst Celanese Corp.*, 43 Mass. App. Ct. 465, 485 (1997) (mentions the presence of the "careful and thoughtful argument for preserving the preponderance rule in lost policy matters" in *Remington Arms Co.* v. *Liberty Mut. Ins. Co.*, 810 F. Supp. at 1423-1426).

In this case, the judge heard extensive testimony concerning the lost policies including trustee Paul Rubenstein's recollection of purchasing insurance through Boit, Dalton & Church, an insurance agency. Admitted in evidence was a schedule of insurance prepared by Boit, Dalton & Church, showing that the trustees were covered by Royal insurance policy 516688, effective October 10, 1969, to October 30, 1972.[3] Specimen forms of the type of policy used by Royal at the time were submitted in evidence. Internal company memoranda forwarded to underwriters stated that pollution exclusion provisions were not in effect when policy 516688 was in place and that riders needed to be attached to all such policies. Two employees of Royal recalled being involved when the policy in question was written.

Our review of the record shows that the judge's findings and conclusions regarding the missing policies met the preponderance of the evidence test and that those findings and conclusions were amply supported by the evidence. See *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 160-161 (1977); *Kendall* v. *Selvaggio*, 413 Mass. 619, 620-621 (1992).

2. *Duty to defend.* What raises the question of the duty to defend is that Royal's policy is a liability policy, not a first-party property damage policy. Royal argues that liability under the policy is not triggered in the absence of a claim by a third party for damages based on injury to the third party's property. The argument is flawed primarily because the allegations set forth in the SMLP complaint "are 'reasonably susceptible' of an interpretation that they state or adumbrate a claim covered by the policy terms . . . ." *Continental Cas. Co.* v. *Gilbane Bldg. Co.*, 391 Mass. 143, 146 (1984), quoting from *Sterilite Corp.* v. *Continental Cas. Co.*, 17 Mass. App. Ct. 316, 318 (1983). SMLP's complaint alleged that the trustees were the owners of the property when the oil leak occurred. SMLP further asserted that when it discovered the leak in 1988, it notified the Department of Environmental Protection and submitted a remedial action plan, as required under Massachusetts law.

It is true, as the amicus brief points out, that SMLP's allegations did not identify contamination on any property other than that sold by the trustees, nor did it seek to recover any cleanup

---

[3]Royal argues that the judge erred in admitting the schedule of insurance as evidence. We perceive no error; the document was correctly admitted as a business record. See G. L. c. 233, § 78; *Commonwealth* v. *LaPlante*, 416 Mass. 433, 441-442 (1993).

costs relating to off-site contamination.[4] There is generally in such cases a determination whether there has been any damage to property other than the insured's since comprehensive general liability (CGL) policies generally exclude coverage for damages to the insured's property. See Abraham, Environmental Liability and the Limits of Insurance, 88 Colum. L. Rev. 942, 966 (1988). In soil contamination situations, however, it is often only the insured's property which is contaminated at the time the cleanup commences. Disposing of hazardous materials is often undertaken at least partially to prevent damage to adjoining property. It would serve "no legitimate purpose to assert that soil and groundwater pollution must be allowed to spread over boundary lines before they can be said to have caused the damage to other people's property which liability insurance is intended to indemnify." *Allstate Ins. Co.* v. *Guinn Constr. Co.*, 713 F. Supp. 35, 41 (D. Mass. 1989). Discouraging cleanups by the property owner or other responsible parties by precluding CGL insurance coverage until contamination has migrated or flowed on to someone else's property runs afoul of the general preference within environmental statutes toward preventative action.

Support for our conclusion is found in analogous cases that involve exclusionary clauses in insurance contracts which are strictly construed against the insurer. See, e.g., *Vappi & Co.* v. *Aetna Cas. & Sur. Co.*, 348 Mass. 427, 431 (1965). See also *Ratner* v. *Canadian Universal Ins. Co.*, 359 Mass. 375, 381 (1971); *Morin* v. *Massachusetts Blue Cross, Inc.*, 365 Mass. 379, 390 (1974); *Middlesex Ins. Co.* v. *American Employers Ins. Co.*, 9 Mass. App. Ct. 855, 856 (1970).

The wrongs to which the policy language extends are those which cause "property damage." See *Hazen Paper Co.* v. *United States Fid. & Guar. Co.*, 407 Mass. 689, 699-700 (1990) (cleanup costs that stem from oil leak are deemed damages when the oil leak causes property damage). Royal's policy defines property damage as "physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof . . . or . . . loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the

---

[4]Royal may not derive help from *Bausch & Lomb, Inc.* v. *Utica Mut. Ins. Co.*, 330 Md. 758 (1993), because in that case the insured voluntarily incurred costs to clean up its own property of hazardous wastes. No claim was made against the insured by any successor owner, abutter, or governmental agency.

policy period." Occurrence is defined as an "accident, including the continuous or repeated exposure to conditions, which results in . . . property damage neither expected nor intended from the standpoint of the insured." In our opinion, these definitions are free and clear of ambiguity, especially the phrase that relates to loss of use of property from repeated exposure to conditions which are "neither expected nor intended." Therefore, we construe those words in their usual and ordinary sense. *Barnstable County Mut. Fire Ins. Co.* v. *Lally,* 374 Mass. 602, 605 (1978). Our inquiry does not stop here, however. The SMLP complaint alleges, among other things, that the trustees are responsible for the cleanup costs. There is a close enough match to the policy provisions to obligate Royal to defend.[5]

Royal also asserts that the trustees suffered no harm because all of the defense costs were absorbed by Wausau and the balance should be "deemed" paid from proceeds of a 1991 judgment obtained against Lumbermens, one of the other insurers. Royal's rationale for declining to defend is that the trustees suffered no harm and therefore have no cause of action. A collateral argument is that once the defense of the insured is assumed by one insurer, the insured has no cause of action against another insurer for refusing to defend. Our review of the record (and the findings of the trial judge) does not support Royal's premise. Affidavits establish that Wausau did not agree to defend the trustees but agreed to advance the costs, under a full reservation of rights. The judge also correctly concluded that the trustees were entitled to a full and complete defense from every insurer having a duty to defend. See, e.g., *Gulf Chem. & Metallurgical Corp.* v. *Associated Metals & Minerals Corp.,* 1 F.3d 365, 372 (5th Cir. 1993); *Emons Indus. Inc.* v. *Liberty Mut. Fire Ins. Co.,* 481 F. Supp. 1022, 1026 (S.D.N.Y. 1979).

Royal also claims that legal fees incurred in excess of the amount advanced by Wausau are unreasonable and should not be included as part of the indemnification award. The only legal fees at issue are those incurred by two of the trustees, Bennett Rubenstein and Adele Asher, whose lawyers charged them an

---

[5]"[T]he question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions: if the allegations of the complaint are 'reasonably susceptible' of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense." *Continental Cas. Co.* v. *Gilbane Bldg. Co.,* 391 Mass. at 146, quoting from *Sterilite Corp.* v. *Continental Cas. Co.,* 17 Mass. App. Ct. at 318.

hourly rate in excess of the $150 per hour that Wausau agreed to advance. Those excess fees amounted to $17,886.70.

Following the conclusion of the indemnity phase of the trial, the judge heard evidence concerning the reasonableness of those fees. Royal did not seriously challenge the reasonableness of the hourly rates charged by the attorneys for Bennett Rubenstein and Adele Asher. Royal's principal point of attack was on the necessity of having three separate law firms defending the trustees. The trustees presented evidence that the decision to retain separate law firms was based on the potential for conflicts of interest among them and on the different approaches the various trustees wished to take in defending the underlying action. The judge accepted the explanation and commented that she would not second-guess the reasonableness of that decision.

She did not, however, award the trustees the full amount of their claim. She declined to award fees where more than one lawyer from any one firm attended a meeting or a deposition. The judge determined that $15,067.70 of the $17,886.70 claimed was reasonable. A judge has wide discretion in making determinations of this nature. *Porter* v. *Treasurer & Collector of Taxes of Worcester*, 385 Mass. 335, 344 (1982). Her decision had ample support in the evidence and there is no basis to disturb it.

3. *Trigger of coverage.*[6] Royal also argues it had no duty to defend the trustees because the property damage to the mill site

---

[6]"Trigger of coverage" is a term of art whereby the court describes what must occur during the policy period for potential coverage to commence under the specific terms of an insurance policy. The term "trigger" is not found in CGL policies themselves and is not automatically invoked by the court to establish certain kinds of policies and categories of cases. Instead, we use the term to describe what must take place for the potential of coverage to be "triggered."

Courts have devised a number of different theories concerning when coverage under CGL policies is triggered. If coverage is triggered at the time that personal injury or property damage becomes known to the victim or property owner, the approach is identified as the "manifestation theory." *Home Ins. Co.* v. *Landmark Ins. Co.*, 205 Cal. App. 3d 1388, 1392 (1988). If coverage is triggered when real personal injury or actual property damage first occurs, the approach is called the "injury in fact theory." *Remmer* v. *Glens Falls Indem. Co.*, 140 Cal. App. 2d 84, 88 (1956). If coverage is triggered when the first exposure to injury-causing conditions occurs, then the court is said to have chosen the "exposure theory." *Insurance Co. of N. America* v. *Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1218-1220 (6th Cir. 1980), cert. denied, 454 U.S. 1109 (1981). Finally, if coverage is triggered in a manner such that insur-

occurred before its first policy went into effect on October 30, 1969, and did not manifest itself until after the last policy period. This argument begs the question. With environmental damage claims under property policies, as with liability policies, it is often difficult to determine when the property damage occurred. A few courts that have considered the issue, however, have held that a loss occurs when the damage first manifests itself. See *Mraz* v. *Canadian Universal Ins. Co.*, 804 F.2d 1325 (4th Cir. 1986); *Home Ins. Co.* v. *Landmark Ins. Co.*, 205 Cal. App. 3d 1388 (1988); *Western Fire Ins. Co.* v. *First Presbyterian Church*, 165 Colo. 34 (1968).

The subject was considered in *Trustees of Tufts Univ.* v. *Commercial Union Ins. Co.*, 415 Mass. 844 (1993). The facts of the case are analogous to what happened here; in addition, the policy language in both cases are nearly identical. Two insurers in the *Tufts* case had written policies for periods after the contaminants had been released and before the contamination was discovered. In those circumstances, the court rejected the manifestation theory, holding that the insurers had a duty to defend. From the *Tufts* decision several guidelines emerge for grappling with the question whether a particular "trigger theory" applies. There is no overriding principle or policy involved; the reasonable expectations of the insured can be taken into account in construing the insurance contract, *id.* at 849, but they are not critical. In the last analysis, the language of the particular policy controls. The focus of inquiry "is whether property damage, as defined in the policies, 'occurred' within the policy period and within the meaning of the word 'occurrence.' " *Id.* at 853 (citation omitted) (see section 2, *supra*). In deciding that the insurers' duty existed irrespective of whether damage or contamination resulting from the release of the hazardous material was discovered or manifested during the policy period, the *Tufts* court fell in line with several jurisdictions which have taken a similar approach. See *New Castle County* v. *Continental Cas. Co.*, 725 F. Supp. 800, 812-813 (D. Del. 1989), rev'd on other grounds, 933 F.2d 1162 (3d Cir. 1991); *Jacksonville Elec. Authy.* v. *Eppinger & Russell Co.*, 776 F. Supp. 1542, 1545 (M.D. Fla. 1991), aff'd, 996 F.2d 1107

ance policies in effect during different time periods all impose a duty to indemnify, then the approach is labeled a "continuous" or "multiple" trigger theory. *Dow Chem. Co.* v. *Associated Indem. Corp.*, 724 F. Supp. 474, 478 (E.D. Mich. 1989).

(11th Cir. 1993); *Chemical Leaman Tank Lines, Inc.* v. *Aetna Cas. & Sur. Co.*, 817 F. Supp. 1136, 1152-1154 (D.N.J. 1993).

4. *Failure to allocate among insurers and years of coverage.* Royal's appeal raises the question whether the trustees' damages should be apportioned among all of the insurers who provided insurance to the trustees during the relevant time period, an issue which no Massachusetts appellate court has decided.

Royal's policy contains standard language providing that the insurer will pay on behalf of the insured *"all sums* which the insured shall become legally obligated to pay as damages. . . ." Courts in other jurisdictions have interpreted this same language to mean that, when multiple policies are triggered to cover the same loss, each policy provides indemnity for the insured's entire liability, and each insurer is jointly and severally liable for the entire claim. See, e.g., *Keene Corp.* v. *Insurance Co. of N. America*, 667 F.2d 1034, 1047-1050 (D.C. Cir. 1981), cert. denied, 455 U.S. 1007 (1982); *Hatco Corp.* v. *W.R. Grace & Co.*, 801 F. Supp. 1334, 1345 (D.N.J. 1992), judgment vacated on other grounds, 59 F.3d 400 (3d Cir. 1995). Of course, there is no bar against an insurer obtaining a share of indemnification or defense costs from other insurers under the doctrine of equitable contribution. *J.H. France Refractories Co.* v. *Allstate Ins. Co.*, 534 Pa. 29, 42 (1993).

Although some courts have taken a different approach where multiple policies have been triggered, holding that the total liability should be apportioned among the responsible insurers, and that each insurer is liable to the insured only for that portion of the loss allocated to it, see, e.g., *Outboard Marine Corp.* v. *Liberty Mut. Ins. Co.*, 283 Ill. App. 3d 630, 642-643 (1996); *Northern States Power Co.* v. *Fidelity & Cas. Co.*, 523 N.W.2d 657, 664 (Minn. 1994), we think that the judge did not err in failing to allocate liability among insurers.

The judge focused on the fact that although most of the oil was released before October of 1969, cleanup did not begin until 1988 or 1989. Thus, the judge concluded, during Royal's policy period (1969-1972), the property was continuously being contaminated by the oil. "The 'occurrence' is the 'injurious exposure' to the hazardous material during the policy periods. The 'property damage' is the continued contamination of soil and groundwater on the site during the policy periods caused by the release of the hazardous material." *Trustees of Tufts Univ.* v.

*Commercial Union Ins. Co.*, 415 Mass. at 848. It was this continuous exposure to the contaminants that the judge correctly thought was decisive. Royal's claim for allocating damage awards based upon years of coverage therefore fails.

5. *The owned property exclusion.* The insurance policy in this case expressly excluded from property damage liability any damage "to property owned or occupied by . . . the insured." What the exclusion means is that the policy was intended to cover only liability of the insured to third parties and not the property of the insured. See *American Home Assur. Co. v. Libbey-Owens-Ford Co.*, 786 F.2d 22, 28 (1st Cir. 1986). When the claim is for damage solely to the insured's property, the exclusion bars coverage. See *Trustees of Tufts Univ. v. Commercial Union Ins. Co.*, 415 Mass. at 852; *Hakim v. Massachusetts Insurers' Insolvency Fund*, 424 Mass. 275, 282 (1997). Here the problem arises because there has been damage to the insured's property as well as to third-party property, and the costs associated with preventing further contamination extend to both.[7]

---

[7]These facts were in dispute at the trial. The judge submitted nine special questions to the jury. We telescope the answers to special questions nos. 6(a) through (e) and no. 8. The jury answered that of the $425,000 paid by the trustees in settlement of the SMLP claim, $250,000 was allocated to remediation of existing contamination on the property, $175,000 was allocated to future remediation of contamination on the property, and none of the settlement proceeds were intended to offset the costs of future remediation of contamination off the property. On the other hand, the jury found that if the SMLP case had gone to trial, SMLP would have been able "to prove that it . . . reasonably expected to incur more than $425,000 . . . to remove oil contaminated soil on the [property] for the purpose of preventing present and/or future groundwater contamination or of preventing present and/or future off-site migration of contaminants."

In her memorandum, the judge explained that when the two answers are considered together, they support the view that at least some of the costs covered by the settlement were properly allocated to work done on the property for the purpose of preventing further contamination of the property. She also noted that as there was no evidence of any intent by SMLP or its consultants to do cleanup work off the property, the jury's answers may well reflect a reasonable conclusion that none of the settlement should be allocated to off-site endeavors. In any event, the judge did not believe that the answers to the questions could be read as a binding determination that no part of the entire settlement was allocated toward prevention of off-site contamination.

Since the judge entered a judgment in favor of the trustees on the point, she is deemed to have made a finding in accord with the judgment, i.e., that some of the costs were related to remediation of off-site property damage. *Velleca v.*

As far as the case before us is concerned, the dichotomy need not implicate the exclusion. See *Hakim* v. *Massachusetts Insurers' Insolvency Fund*, 424 Mass. at 279-280. The *Hakim* opinion speaks of the "owned property exclusion . . . not reliev[ing] the insurer of all liability for response costs incurred by the cleanup of the policyholder's own property . . . if the cleanup is designed to remediate, to prevent, or to abate further migration of contaminants to the off-site property." *Id.* at 279. This is the case even if the contaminating substances are solely on the insured's land. See *Gerrish Corp.* v. *Universal Underwriters Ins. Co.*, 947 F.2d 1023, 1030-31 (2d Cir. 1991), cert. denied, 504 U.S. 973 (1992). See also *Broadwell Realty Servs. Inc.* v. *Fidelity & Cas. Co.*, 218 N.J. Super. 516, 526 (App. Div. 1987).

In answers to special questions, the jury found that the fuel oil that leaked from the old tank had contaminated the groundwater and had migrated beyond the boundaries of the site. The jury also found that there existed an imminent or immediate threat of additional pollution of the groundwater and migration of the oil beyond the boundaries of the site. The record in this case supports these findings. Based on the testing of the samples taken from the site, Ambrose Donovan, the project engineer of a firm hired to assess the extent of the contamination and to prepare a remedial plan, opined that the oil had migrated off the mill property site and that the groundwater had been contaminated. The owned property exclusion of the policy is, therefore, not applicable.[8]

6. *The alienated premises exclusion.* A second exclusion contained in the Royal policy provides that the insurance does not apply "to property damage to premises alienated by the named insured arising out of such premises or any part thereof." The judge ruled that this exclusion does not apply when the property damage takes place before the insured transfers the property.

---

*Uniroyal Tire Co.*, 36 Mass. App. Ct. 247, 251 (1994). Since that finding is not clearly erroneous, the judgment on that point will stand.

[8]We recognize that in *Hakim* v. *Massachusetts Insurers' Insolvency Fund*, 424 Mass. at 282, the court held that "[c]osts incurred for the sole purpose of remediating the [insureds'] property are barred by the owned property exclusion of the policy." In the present case, the jury found that had the SMLP case gone to trial, SMLP would have proved that it would incur more than $425,000 to prevent off-site migration of contaminants. In light of this finding, we do not remand this case for further proceedings. We also note that Royal did not raise this specific issue on appeal.

Royal argues that the judge ignored the contextual meaning of the policy's provisions. Expressed more concisely, Royal claims that the alienated property exclusion bars coverage in this case because the damage to the property was not discovered until after the transfer to SMLP when the policy was no longer in effect; Royal argues that any other interpretation runs counter to the plain meaning of the applicable provisions. See, e.g., *Continental Cas. Co.* v. *Gilbane Bldg. Co.*, 391 Mass. at 147.

The judge did not take such a narrow view. She concluded that coverage is afforded under the policy because the harm took place within Royal's policy period which was before the trustees sold the property. The judge made a finding, supported by the record, that the underground tank began leaking before transfer of the property to SMLP and that the alienated premises exclusion did not prevent indemnification by the insurer. See, e.g., *Wilmington Island Constr. Co.* v. *Cincinnati Ins. Co.*, 179 Ga. App. 477, 477-478 (1986) (policy provided coverage until time insured alienated the premises; exclusion applied to property damage occurring after alienation); *McKellar Dev. of Nevada, Inc.* v. *Northern Ins. Co.*, 108 Nev. 729, 733-734 (1992) (alienated premises exclusion ruled inapplicable because property damage arguably occurred before alienation).[9] Although the Supreme Judicial Court did not have occasion in *Hakim* to address the alienated premises exclusion, the same result ought to pertain. Given the factual findings that SMLP's claims arose from actual damage to third-party property, including off-site groundwater contamination, we conclude that the judge did not err in ruling that the alienated premises exclusion is inapplicable.

7. *Offsetting the settlement.* For their part, the trustees argue that the judge erred in crediting the $252,500 received in settlements from other insurers against Royal's liability. They contend that, at most, the credit be limited to the portion of each settlement that was paid to discharge each insurer's duty to defend. In rejecting the trustees' argument, the judge acknowledged that the amount for which Royal is held liable will not duplicate

[9]In support of its position, Royal primarily relies on *Borden, Inc.* v. *Affiliated FM Ins. Co.*, 682 F. Supp. 927 (S.D. Ohio 1987), aff'd, 865 F.2d 1267 (6th Cir.), cert. denied, 493 U.S. 817 (1989). That case, however, turned on a special circumstance not found here, which was "the alleged failure of [the insured] to disclose the presence of hazardous wastes on land which it conveyed . . . ." 682 F. Supp. at 930. As the trial judge correctly noted, *Borden* does not address the key timing question discussed above.

those portions of the settlements allocated to defense costs. Nevertheless, she concluded that because the trustees had been fully reimbursed by Wausau for defense costs, any award of damages against Royal that did not offset the full amount of the settlements would result in the trustees receiving cumulative damages for the same wrong.

The settlement agreements are not part of the record, so we cannot say with certainty whether they purport to separate the portion attributable to indemnity from defense costs. Furthermore, as the judge pointed out in her memorandum, the trustees have already received reimbursement for almost all of their defense costs from Wausau. Any award of damages against Royal which did not credit the settlements seems to provide cumulative damages for indemnity. See, e.g., *Tritsch* v. *Boston Edison Co.*, 363 Mass. 179, 182 (1973) (plaintiff cannot receive remuneration in amounts greater than actual damages); *McGrath* v. *Mishara*, 386 Mass. 74, 83-85 (1982); *Outboard Marine Corp.* v. *Liberty Mut. Ins. Co.*, 283 Ill. App. 3d at 645-646.

8. *Recovery of attorney's fees.* In denying the trustee's motion to recover legal fees incurred as a result of litigating the declaratory judgment action, the trial judge felt constrained by the "American Rule," see *Waldman* v. *American Honda Motor Co.*, 413 Mass. 320, 321-323 (1992), that legal fees are not recoverable as an element of damages. She did not, however, have the benefit of the Supreme Judicial Court's recent decision in *Preferred Mut. Ins. Co.* v. *Gamache*, 426 Mass. 93, 95-96 (1997). In that case, the court created another exception to the traditional common-law rule requiring litigants to absorb their own legal expenses. It held that an insured under a homeowner's policy is entitled to reasonable attorney's fees and expenses incurred in successfully establishing the insurer's duty to defend. There is no plausible reason why a comprehensive liability insurer should enjoy more freedom to litigate that issue without concern about the possibility of having to pay the insured's attorney's fees than in the case of a homeowner's insurer. Cf. *Commerce Ins. Co.* v. *Betty Caplette Builders Inc.*, 420 Mass. 87, 93 (1996).

Accordingly, the case is remanded to the Superior Court for assessment of attorney's fees. In all other respects, the judgment is affirmed.

*So ordered.*