Hely, Charles J., J.
A.Introduction
The plaintiff Helen Walsh made a claim on her homeowners insurance policy for damage caused by a heating oil leak in her home. The insurer, the defendant Hingham Mutual, denied coverage under the liability coverage in the policy. Hingham Mutual based the denial of liability coverage on an exclusion for damage to property owned by the insured (the “owned property” exclusion). Mrs. Walsh’s complaint alleges that the denial of coverage was a breach of the insurance contract and a violation of G.L.c. 93A and 176D. Her complaint seeks damages and declaratory relief.
The case was tried before the court without a juiy. The court finds that the denial of coverage was proper because the damage from the leaked fuel oil was solely on Mrs. Walsh’s property and there has been no imminent or substantial threat of damage to a neighboring property.
B.The “Owned Property” Exclusion to the Liability Coverage
The parties agree that Mrs.Walsh’s loss is not covered by the “Property Coverages” of the policy. The “Property Coverages” provide indemnification for damage to the residence but not land or underground water. The “Property Coverages” part of the policy also has exclusions for losses resulting from wear and tear, deterioration, rust, contamination or release of contaminants or pollutants. Ex. 1, HM-ML-555.
Mrs. Walsh contends that under the liability coverage of her policy Hingham Mutual has a duly to indemnify her and a duty to defend her regarding an administrative enforcement action by the Commonwealth under G.L.c. 2 IE.
Hingham Mutual contends that there is no liability coverage for Mrs. Walsh’s loss based on the owned property exclusion. This is an exclusion from the policy’s Coverage L — Personal Liability coverage. The exclusion states: “Coverage L does not apply to . . . damage to property owned by an insured.”
C.Facts
Mrs. Walsh lives in an eighteenth-centuiy house in Middleboro. The house is on a three-and-a-half-acre lot at 227 Plymouth Street. On September 2, 2002, Mrs. Walsh had no heat in the house. Her oil company came that day, Labor Day, and restored her heat by putting ten gallons of home heating oil in her basement tank. The next day, Mrs.Walsh’s heat failed again. The oil company discovered that the tank was empty due to a leak in the bottom of Mrs. Walsh’s tank.
Mrs. Walsh’s basement has a dirt floor. Oil from her tank had leaked into the ground in the vicinity of the tank. On September 3, Mrs. Walsh notified her insurance agency of the oil spill. Hingham Mutual and Mrs. Walsh’s insurance agency assigned Frank Mullins, an independent adjuster, to handle the claim. Mr. Mullins inspected the property and interviewed Mrs. Walsh on September 4. He told her that the insurer would not cover the damage if the oil did not migrate to another person’s property. Hingham Mutual notified Mrs. Walsh in a September 5 letter that they would “handle! ) the claim with a full reservation of rights.”
On September 10, 2002, the Massachusetts Department of Environmental Protection sent Mrs. Walsh a notice of responsibility (“NOR”) under G.L.c. 21E. The notice of responsibility stated that the leak had caused a release of an estimated 100 to 140 gallons of fuel oil “to the soil located below the tank.” Ex. 5. The notice of responsibility required Mrs. Walsh to undertake necessary response actions and to hire a licensed site professional for this purpose.
With the approval of the Department of Environmental Protection, Mrs. Walsh hired East Coast Engineering. In November 2002, East Coast made an excavation in the soil below the old tank’s location. The soil excavation was six feet long, four feet wide and four feet deep. They removed about three cubic yards of contaminated soil. The excavation did not attempt to remove all the contaminated soil. Further excavation was not done because it would be likely to undermine the house’s fieldstone foundation and an adjacent support beam. A smaller hole, however, revealed a petroleum smell in the soil six feet below the ground surface at the location of the old tank. .The excavated contaminated soil was removed from Mrs. Walsh’s property on January 6, 2003.
Mark T. Wilkin of Hingham Mutual’s claims department sent Mrs. Walsh a November 22, 2002, letter denying coverage for the deteriorated oil tank and the resulting pollution claim. The letter also asked Mrs. Walsh to call Mr. Wilkin if the situation changed and the matter involved “a migration of pollutants off premises.”
On April 1, 2003, Mrs. Walsh’s attorney wrote to Hingham Mutual calling on them to “defend Mrs. Walsh with regards to the NOR and to indemnify her under the terms of the policy." Mr. Wilkin replied by letter on April 7, 2003. He requested a copy of the *53 notice of responsibility and any correspondence with the Department of Environmental Protection and Mrs. Walsh’s licensed site professional. Mr. Wilkin’s letter also quoted the owned property exclusion as an exclusion from the personal liability coverage.
Mrs. Walsh hired Applied Enviro-Tech (“Applied”) to perform testing and make recommendations. On March 20, 2003, Applied did soil test borings and installed three groundwater monitoring wells at the premises. Applied put one monitoring well (AET-3) in the northeast corner of Mrs. Walsh’s basement at the former location of the old oil tank. Applied put the other two monitoring wells in Mrs. Walsh’s yard near the northeast comer of her house. One of the outside wells (AET-1) was on the side near the gravel driveway and about seven feet from the house. The side exterior well was about thirty-five to forty feet from a neighbor’s wooded land on the east side of Mrs. Walsh’s property. (Heffron and Mullen recall testimony.)
The other outside well (AET-2) was in the front yard about five feet from the house. The front exterior well was fifty-two feet to the pavement of Plymouth Street. (Mullen recall testimony.) The unmarked border of the public way (the public layout for the street) is about ten feet closer to the house than the pavement. This means that the front exterior well was probably around forty-two feet to the unpaved border of the public way.
The March 20, 2003, samples from the monitoring well in the basement contained contaminants in the soil and in the groundwater at significant levels, levels that required reporting and cleanup under the Massachusetts Contingency Plan. The soil and groundwater samples from the two outside wells detected no contamination. Ex. 20, p. 3. Applied’s testing of the indoor air also revealed no significant problems.
Applied’s May 21, 2003 report, Ex. 19, stated that “on-site groundwater” has been impacted at the basement monitoring wells by the release of the heating oil. Applied’s report stated that there is “a potential” for migration to occur that “may eventually impact” off-site downgradient properties. Applied’s report recommended remediation of the soil contamination by oxygen releasing compounds and geoprobe hand tools followed by further monitoring of the soil, groundwater and indoor air.
On June 13, 2003, Mrs. Walsh’s attorney sent Mr. Wilkin a copy of Applied’s report. In a June 18, 2003, reply, Mr. Wilkin reiterated Hingham Mutual’s position that there was no liability coverage because the contamination was only on the insured’s property. Mr. Wilkin’s letter disagreed with the assertion by Applied and Mrs. Walsh’s attorney that the Commonwealth owns the groundwater on individual properties.
A year and a month later, Mrs. Walsh’s attorney sent Mr. Wilkin his July 29, 2004, Chapter 93A demand letter. The demand letter contained his arguments in favor of a duty to defend and to indemnify. Hingham Mutual’s attorney replied on August 3, 2004, denying relief and stating Hingham Mutual’s reasons. This letter pointed out that neither Mrs. Walsh nor her attorney had as yet sent Hingham Mutual a copy of the notice of responsibility.
On August 11, 2004, Mrs. Walsh’s attorney sent Hingham Mutual a copy of the notice of responsibility. Receipt of the notice of responsibility did not change Hingham Mutual’s coverage position. They so informed Mrs. Walsh’s attorney. Mrs. Walsh filed her Superior Court action in this case on August 30, 2004.
On December 8, 2005, Applied returned to Mrs. Walsh’s property and took further groundwater samples from the three monitoring wells that had been installed in March 2003. The groundwater from the basement monitoring well continued to contain contaminants in excess of Massachusetts Contingency Plan standards. The groundwater from the front yard well was also in excess of state contamination standards: one of the seventeen tested contamination components exceeded the standards. The groundwater from the side yard well contained no detectable contaminants.[1]
An abandoned drinking water well on Mrs. Walsh’s property (DW-1) also contained no detectable contaminants.
There has been no further testing of the groundwater and soil at the site since December 8, 2005.
D. Further Findings on Contaminant Migration
Anne Heffron is the owner and operating manager of Applied. She is a geologist and a licensed site professional and a well qualified expert. She evaluated the site for Mrs. Walsh and testified as an expert witness on her behalf. Ms. Heffron testified that in her opinion the heating oil release on Mrs. Walsh’s property presented a significant and imminent threat in 2003 of migration to neighboring property.
Joseph Salvetti was a licensed site professional retained by Hingham Mutual. He, too, is a well qualified expert. Mr. Salvetti testified that in his opinion the heating oil release on Mrs. Walsh’s property did not present an imminent threat of migration off the site.
Considering the evidence as a whole, I find that from the time of the discovery of the heating oil release in September 2002, there has been no imminent or substantial threat that contaminants from the release would migrate to a neighboring property. Since the discovery of the release in 2002, there has only been a slight risk that contamination will migrate to a neighboring property. On the whole, Mr. Salvetti’s opinion on the migration issue is more reliable and better supported by the evidence than the opinion of Ms. Heffron. Several factors support these findings.
The soil below the house is medium grain, sandy glacial outwash soil. The nature of the soil and the relatively flat contours of the land are both conducive *54 to downward rather than lateral migration. These were important factors causing a minimal risk of migration of oil contaminants to a neighboring property. It should also be noted that home heating oil is considerably heavier and denser than gasoline; it migrates much more slowly.
The excavation and the off-site removal of the soil from below the tank was also important in reducing the risk of migration. This excavation and soil removal and the tank removal eliminated most of the source for potential migration of contaminants.
The minimal amount of oil contaminant migration that has occurred on the property has happened veiy slowly. In the six-month period between the September 2002 leak discovery and the March 2003 testing, there was no lateral migration of contaminants beyond the soil and groundwater under the old tank location.
In the next two years and eight-and-a-half months between the March 2003 and December 2005 tests, the lateral migration rate and quantity were tiny. Some perceptible contaminant migrated five to seven feet between the basement monitoring well and one of the outside monitoring wells. In December 2005, only one of seventeen contaminant factors was discovered in groundwater in one of the two exterior monitoring wells. This slight migration toward the front was still forty-five feet away from the public way. No contaminant factors were discovered in the groundwater in the second exterior monitoring well or in the old drinking well. No contaminant factors were discovered in the exterior soil.
A natural bioremediation has occurred in the years since the discovery of the release in September 2002. Rainwater and favorable soil conditions in this period have caused a natural absorption and attenuation of the contaminant. The soil, climate and natural bioremediation factors have resulted in a lack of any evidence of any lateral migration of contaminants since December 2005. There has been no observed migration of contaminants beyond the single contaminant found in one test well five feet from the house foundation in 2005.
E. Duty to Indemnify and the Owned Property Exclusion
With respect to the liability coverage in a homeowners policy, the Supreme Judicial Court has made it clear that where there has been contamination of adjacent property, “the costs of remedial efforts to prevent further contamination of that property are not excluded from coverage by the owned property clause.” Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 280 (1997). In the Hakim case it was undisputed that there was contamination of the waterways adjacent to the insured’s property. 424 Mass. at 280, n.8. The court in Hakim recognized but declined to resolve the issue of “whether the owned property exclusion bars coverage if there is an imminent threat of, but no actual contamination of, the property of another.” Id.
If the oil release on Mrs. Walsh’s property presented an imminent or substantial threat of groundwater damage or other damage on property not owned by the insured, the court would require the liability insurer to indemnify the insured for response costs required by the Commonwealth to prevent damage to another person’s property. This is consistent with the nature of the liability coverage. See Rubenstein v. Royal Insurance Co. of America, 44 Mass.App.Ct. 842, 848 (1998).[2]
Liability coverage is designed to indemnify the insured when a claim by another party (including a claim by the Commonwealth) requires the insured to incur costs to reduce the damage tó another person’s property or to compensate the other person for personal injury or damage to his or her property. Liability coverage is reasonably interpreted as also covering costs required by the Commonwealth to prevent damage on another person’s property if contamination on the insured’s property is presenting an imminent or substantial risk of damage on another person’s property. When the Commonwealth, acting under our environmental protection laws, compels an insured to incur costs to prevent damage on another person’s property, those costs are closely related to damage to the other property even if the damage has not yet occurred. Such costs will fairly be treated as within the liability coverage to the extent that the required response action is ordered for the purpose of alleviating an imminent or substantial threat of damage on the other property. The imminent or substantial threat standard fairly protects the reasonable expectations of the insured without distorting the actual language of the policy or the purpose of the coverage.
In the present case, there has been no damage on any neighboring property. There has been no imminent or substantial threat of such damage. The risk that contamination would migrate to a neighboring property was slight at the time of the last groundwater test in December 2005. There is no evidence that the risk has increased since then. It is more likely that it has decreased. The owned property exclusion. excludes coverage in these circumstances. Hingham Mutual has no duty to indemnify Mrs. Walsh for her response costs.
The plaintiff also argues that the groundwater on her property is owned by the Commonwealth and that therefore the exclusion for property owned by the insured does not exclude liability coverage in this case.
The Commonwealth and its cities, towns, water authorities and water districts have extensive regulatory powers over groundwater. See G.L.c. 21G (Massachusetts Water Management Act authorizing regulations limiting the volume of water withdrawals); c. 21E (oil and hazardous material release prevention); c. 131, §§40 and 40A (wetlands protection). The Com *55 monwealth has the legal authority to control and restrict groundwater on private property in order to protect the public water supply, public health and the environment. The Commonwealth may restrict and in some circumstances prohibit a landowner’s use of ground water. Massachusetts statutes and case law recognize that the Commonwealth’s regulatory powers over groundwater are vital to the public interest. Landowners no longer have “absolute control over subsurface water.” See Prince v. Stockdell, 397 Mass. 843, 845 (1986); Tucker v. Badojan, 376 Mass. 907, 916-19 (1978) (discussion of the reasonable use doctrine).
The Commonwealth’s extensive regulatory powers over groundwater are nevertheless not the legal equivalent of separate legal ownership by the Commonwealth of all groundwater on private property. Private landowners still retain separate ownership rights, even though their use of the ground water is subject to extensive regulation by the Commonwealth. See Opinion of the Justices, 300 Mass. 607, 612 (1938). Because the Commonwealth’s extensive regulatory interest in groundwater on private property is not the equivalent of ownership, liability coverage for pollution damage to groundwater on the insured’s property is excluded by the exclusion for damage to property owned by the insured.
F.Duty to Defend
With respect to a duty to defend, the court in Hazen Paper Co. v. United States Fidelity and Guaranty Co., 407 Mass. 689, 695 (1990), held that a letter from a federal or state environmental agency may be “so substantially equivalent to the commencement of a lawsuit” that a duty to defend may arise immediately. Hazen Paper Company, the insured in Hazen Paper, had shipped drums of hazardous material to the ReSolve, Inc. hazardous waste facility. There was a release of hazardous substances at the Re-Solve site. 407 Mass. at 690. The court held that a duty to defend arose from a letter to the insured from the United States Environmental Protection Administration (EPA). The EPA letter asserted that “ ‘actual releases of hazardous substances’ were occurring at the ReSolve site.” The Re-Solve site was not the insured’s property, and the court’s opinion was not concerned with an owned property exclusion.
In contrast, the court in Hazen Paper also held that a letter to the insured from the Massachusetts Department of Environmental Quality Engineering “does not allege the occurrence of any damage that falls within the policy coverage” because the DEQE letter claimed “only a threat” of the release of hazardous material from the drums at the Re-Solve site. 407 Mass, at 695. The court held that the “DEQE claim, as expressed in the letter is not the equivalent of a suit” and that summary judgment for the insured on this point was not warranted. Id.
The Department of Environmental Protection notice of responsibilily sent to Mrs. Walsh in this case stated that the Department had been notified of a release and/or threat of release “at the above referenced property” [227 Plymouth Street]. The notice of responsibility contains no allegation that a contaminant had migrated to a neighboring property. The notice of responsibility does not refer to a specific threat of contaminant migration to a neighboring property. The court finds from the evidence that the notice of responsibility does not allege damage to another person’s property or an immediate or substantial threat of such damage. The notice of responsibility does not allege “damage that falls within the policy coverage.” Hazen Paper, 407 Mass, at 695. Applying the analysis in Hazen Paper, the notice of responsibility on the facts in this case did not generate a duty to defend under the liability coverage of Mrs. Walsh’s property.
It should also be noted that Mrs. Walsh’s attorney did not send Hingham Mutual a copy of the notice of responsibility until August 11, 2004. Neither the notice of responsibility nor the information reported to the insurer before and after that date generated a duty to defend under the liability coverage.
G.Claim Under G.L.c. 93A and 176D
The insurer in this case did not engage in any unfair claim settlement practice or other unfair or deceptive practice. The insurer promptly investigated the claim and promptly replied to the insured’s correspondence. The insurer set forth legitimate reasons for its denial of coverage. The insurer’s denial of an indemnity obligation and its conduct in not accepting a duty to defend in response to the notice of responsibility were reasonably supported by the evidence. There was no violation of G.L.c. 93A or c. 176D. Guity v. Commerce Ins. Co., 36 Mass.App.Ct. 339, 343 (1994) (a “plausible, reasoned legal position that may ultimately turn out to be mistaken ... is outside the scope of the punitive aspects of the combined application of c. 93A and c. 176D”).
H.Order
A judgment will enter:
(1) declaring that the defendant Hingham Mutual Insurance Company has no duty to defend or indemnify the plaintiff Helen Walsh on the damage claims alleged in her complaint; and
(2) dismissing the plaintiffs contract and Chapter 93A claims.

 From the testimony alone, it was not clear to the court which of the two exterior wells contained a detectable groundwater contaminant in December 2005. The contaminant was in the monitoring well designated AET-2. Applied Report, 1/11/06, Ex. 20, p. 3. Considering the site diagrams in Ex. 18 and 20, Ms. Heffron’s narrative report in Ex. 20, and the witnesses’ testimony as a whole, I find that AET-2 was the front exterior monitoring well, the well on the north side in the direction of the street.
Both exterior wells are within ten feet of the house. Whether the 2005 contamination in one of the exterior wells was in the front well or the side well has no material effect on *56 determining the nature of the risk that contamination will migrate to a neighboring property.

 The court in Rubenstein discussed in dicta possible liability coverage for cleanup costs without discussing a possible requirement of an imminent or substantial threat of damage to other property. The jury in that case, however, had made a finding both that the oil had migrated beyond the boundaries of the insured’s site and that there was “an imminent or immediate threat of additional pollution of the groundwater and migration of the oil beyond the boundaries of the site." 44 Mass.App.Ct. at 854.