338 F.3d 42
LEXINGTON INSURANCE COMPANY, Plaintiff, Appellee,v.GENERAL ACCIDENT INSURANCE COMPANY OF AMERICA, Defendant, Appellant.
No. 03-1124.
United States Court of Appeals, First Circuit.
Heard June 3, 2003.
Decided August 4, 2003.

COPYRIGHT MATERIAL OMITTED Jonathan S. Reed, with whom Traub Eglin Lieberman Straus, Scott L. Machanic, and Cunningham, Machanic, Celtin, Johnson & Harney, LLP were on brief, for appellant.
Robert M. Elmer, with whom Allan E. Taylor and Taylor, Duane, Barton & Gilman, LLP were on brief, for appellee.
Before SELYA and LIPEZ, Circuit Judges, and PONSOR,* District Judge.
SELYA, Circuit Judge.

1
Defendant-appellant General Accident Insurance Company of America (General Accident) claims that it is entitled to reimbursement from plaintiff-appellee Lexington Insurance Company (Lexington) for a pro rata share of defense costs incurred on behalf of the parties' mutual insured. The district court disagreed, and General Accident now appeals. We affirm.

2
The essential facts are not in dispute. General Accident issued a professional responsibility policy with an aggregate limit of liability of $10,000,000 to the law firm of Blank, Rome, Comisky & McCauley (Blank Rome). Desiring extra protection, the insured purchased four separate excess insurance policies. Lexington underwrote the first layer of excess coverage under a policy containing an aggregate liability limit of $15,000,000. Blank Rome procured second-layer excess policies from Safety National Insurance Company (Safety National), International Surplus Lines Insurance Company (ISLIC), and American Insurance Company (American), respectively. All five policies were in effect for a one-year period beginning April 8, 1984. They collectively afforded Blank Rome $50,000,000 in professional liability coverage.

3
During the currency of the policies, Blank Rome was rocked by a series of securities fraud suits arising out of the collapse of a failed financial institution. General Accident undertook Blank Rome's defense. That undertaking lasted until July 28, 1988, when Blank Rome assumed responsibility for its own defense.1 General Accident claims, without contradiction, to have incurred roughly $5,500,000 in legal fees and ancillary expenses while defending Blank Rome.

4
Unwilling to shoulder the load alone, General Accident sought to compel the four excess carriers to help defray the defense costs it had expended. Using limits of liability as a guide, it calculated each company's ratable share of the $5,500,000 total. Under this formula, it earmarked $1,650,000 (30% of the total) as Lexington's responsibility.

5
Lexington balked at this suggestion. It did, however, enter into an agreement with General Accident to toll the statute of limitations while the insurers "explore[d] the potential for resolution of General Accident's claims without resort to litigation." Although General Accident eventually resolved its claims against Safety National, ISLIC, and American, its dispute with Lexington proved intractable.

6
In an effort to bring matters to a head, Lexington brought a diversity action in the United States District Court for the District of Massachusetts. See 28 U.S.C. § 1332(a). Lexington took the position that its policy unambiguously excluded the payment of defense costs and asked the court to declare that it had no obligation to reimburse General Accident for Blank Rome's defense.

7
Lexington relied primarily on language in its policy stating that it would indemnify Blank Rome:

8
... in accordance with the applicable insuring agreements, terms, conditions and exclusions of the Underlying Policy [i.e., the General Accident policy] ... except as regards the premium, the obligation to investigate and defend and for costs and expenses incident to the same,... and any other provision therein inconsistent with this policy.

9
Noting that its policy defined "costs" as "interest on judgments, investigations, adjustments and legal expenses" (emphasis supplied), Lexington contended that General Accident's expenditures — which were legal expenses incident to the insured's defense — were excluded.

10
General Accident took a different slant. It sought to have Lexington share in the legal expenses both as a matter of contract and under the doctrine of equitable contribution. The linchpin of General Accident's claim was an apportionment provision contained within the limits of liability section of its policy. That provision, entitled "Apportionment of Claims Expenses," reads:

11
In the event payment for damages by the Insured, any other carrier on behalf of the Insured and the Company is in excess of the amount of the limit available under this policy, the Company shall be obligated to pay that proportion of claim expenses as the amount of damages paid by the Company bears to the total amount of damages.

12
In General Accident's view, this language imposed an expense-sharing obligation on Lexington both as a matter of contract and as a matter of equity.

13
In due season, the parties cross-moved for summary judgment. Lexington urged the district court to find that its policy exculpated it from any responsibility to share in the cost of Blank Rome's defense whereas General Accident exhorted the district court to find Lexington's policy ambiguous because it neither explicitly disclaimed a duty to reimburse the primary insurer nor specifically negated the applicability of the apportionment provision contained in the underlying policy. In this regard, General Accident posited that Lexington, as the second-in-time insurer, had the obligation to repudiate explicitly any language in the underlying policy that it found to be objectionable and to clarify that it was excepting itself from an otherwise comprehensive and integrated insurance program that followed the form of the underlying policy. As a fallback, General Accident invoked the doctrine of equitable contribution.

14
The district court resolved this clash in Lexington's favor. See Lexington Ins. Co. v. Gen. Accid. Ins. Co., Civ. No. 01-11556, slip op. (D.Mass. Dec. 20, 2002) (unpublished). The court concluded that Lexington's policy was unambiguous; that its language clearly established Lexington's intent not to participate in the payment of Blank Rome's defense costs; and that, therefore, Lexington was not obligated to reimburse General Accident for any part of the defense costs that it had incurred. Id. at 8. In addition, the court rejected General Accident's equitable contribution theory. Id. This timely appeal ensued.

15
This appeal presents a purely legal question. The facts are undisputed, and the district court had no occasion to engage in differential factfinding. The general rule is that orders granting summary judgment are reviewed de novo, e.g., Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir.1999), and that standard applies here. In all events, a trial court's interpretation of an insurance contract is equally subject to de novo review. See Utica Mut. Ins. Co. v. Weathermark Invs., Inc., 292 F.3d 77, 80 (1st Cir.2002); Greenly v. Mariner Mgmt. Group, Inc., 192 F.3d 22, 25-27 (1st Cir. 1999).

16
Before embarking upon our analysis, we pause to discuss a preliminary matter. It is a black-letter rule that state substantive law supplies the rules of decision for a federal court sitting in diversity jurisdiction. Erie R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Crellin Techs., Inc. v. Equipmentlease Corp., 18 F.3d 1, 4 (1st Cir.1994). Thus, the initial question involves which source of law should guide our interpretive efforts.

17
In determining what state law is relevant, a federal court must apply the choice-of-law framework of the forum state (here, Massachusetts). See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 491, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Crellin Techs., 18 F.3d at 4. In this instance, the choice is between Pennsylvania (home to General Accident and Blank Rome) and Massachusetts (where Lexington is based). Our research reveals no material differences between the laws of these two jurisdictions with respect to the interpretive task that confronts us. That circumstance renders further inquiry unnecessary.

18
It is a well-established — and prudential — principle that when the result in a case will not be affected by the choice of law, an inquiring court, in its discretion, may simply bypass the choice. See, e.g., Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1092 (1st Cir.1989). That course is especially attractive where, as here, the parties have taken the position that either state's law will lead to the same result. Cf. Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir.1991) (explaining that when the parties achieve a satisfactory consensus on choice of law, a federal court sitting in diversity jurisdiction is free, if it so elects, to forgo independent analysis and accept the parties' agreement). Because the choice-of-law question in this case has been reduced to the point where nothing turns on a more precise refinement, we eschew any further inquiry. In the discussion that follows, we will cite interchangeably to applicable Pennsylvania and Massachusetts precedents.

19
The baseline rule in both Pennsylvania and Massachusetts is that insurance contracts must be interpreted to reflect the intention of the parties as manifested by the policy language. See Travelers Cas. & Sur. Co. v. Castegnaro, 565 Pa. 246, 772 A.2d 456, 459 (2001); Affiliated FM Ins. Co. v. Const. Reins. Co., 416 Mass. 839, 626 N.E.2d 878, 881 (1994). When the policy language is plain and admits of only one reasonable construction, a reviewing court must give effect to that construction. See Riccio v. Am. Repub. Ins. Co., 550 Pa. 254, 705 A.2d 422, 426 (1997); Cody v. Conn. Gen. Life Ins. Co., 387 Mass. 142, 439 N.E.2d 234, 237 (1982); accord GRE Ins. Group v. Metro. Boston Hous. P'ship, Inc., 61 F.3d 79, 81 (1st Cir. 1995) (applying Massachusetts law). If, however, a policy provision is ambiguous, the court may take extrinsic evidence as to intent, and, absent clarification, ordinarily may adopt the interpretation that favors coverage (that is, the reading most beneficial to the insured). See Bateman v. Motorists Mut. Ins. Co., 527 Pa. 241, 590 A.2d 281, 283 (1991); Hazen Paper Co. v. United States Fid. & Guar. Co., 407 Mass. 689, 555 N.E.2d 576, 583 (1990); see also Merchants Ins. Co. v. United States Fid. & Guar. Co., 143 F.3d 5, 8 (1st Cir.1998) (applying Massachusetts law).

20
We caution that an ambiguity is not created merely because an imaginative reader devises a way to split hairs. Nor is an insurance policy ambiguous simply because its terminology sparks a controversy between two parties, each of whom advocates an interpretation contrary to the other. See Citation Ins. Co. v. Gomez, 426 Mass. 379, 688 N.E.2d 951, 953 (1998); Riccio v. Am. Repub. Ins. Co., 453 Pa.Super. 364, 683 A.2d 1226, 1233 (1996), aff'd, 550 Pa. 254, 705 A.2d 422 (1997). Absent a genuine issue as to meaning, there is no ambiguity. See, e.g., Suffolk Const. Co. v. Lanco Scaffolding Co., 47 Mass.App.Ct. 726, 716 N.E.2d 130, 133 (Mass.App.Ct. 1999) (stating that contract language is ambiguous only where "an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken") (quoting Fashion House, 892 F.2d at 1083); Hutchison v. Sunbeam Coal Corp., 513 Pa. 192, 519 A.2d 385, 390 (1986) (similar).

21
It is against this jurisprudential backdrop that we evaluate the coverage issue in this case. The task is simplified by the clarity of Lexington's policy, which unambiguously states that Lexington will indemnify Blank Rome in accordance with the underlying (General Accident) policy "except as regards ... the obligation to investigate and defend and for costs and expenses incident to the same...." This phraseology admits of only one sensible interpretation: that the Lexington policy follows the form of the underlying policy except as to particular provisions (such as those related to the costs of Blank Rome's defense). The language hardly could be clearer.

22
If more were needed — and we doubt that it is — nothing in the policy itself obliged Lexington either to assume any responsibility for legal costs or to engage in expense-sharing with Blank Rome's other insurers. Nor does the fact that General Accident, rather than Blank Rome, was the party seeking reimbursement disguise the reality of events. The costs in question were incurred in the defense of Blank Rome, and, thus, were plainly excluded from the scope of Lexington's coverage.

23
By like token, the apportionment provision in General Accident's policy did not transform the legal landscape. That proviso does no more than disclaim any obligation on General Accident's part to pay more than its proportionate share of Blank Rome's defense costs; it does not impose on any excess carrier a duty to reimburse General Accident for a pro rata share of those costs.2 Given this circumstance, it was pointless (and, thus, unnecessary) for Lexington expressly to deny a non-existent obligation to indemnify General Accident.

24
That effectively ends the matter. In construing insurance contracts, courts have no warrant either to convolute the straightforward meaning of policy language or to endow the words with a gloss that is belied by the language itself. See 116 Commonwealth Condo. Trust v. Aetna Cas. & Sur. Co., 433 Mass. 373, 742 N.E.2d 76, 78 (2001); Loomer v. M.R.T. Flying Service, Inc., 384 Pa.Super. 244, 558 A.2d 103, 105 (1989). Like beauty, ambiguity sometimes lies solely in the eye of the beholder. Seaco Ins. Co. v. Davis-Irish, 300 F.3d 84, 87 (1st Cir.2002). So it is here.

25
In an effort to blunt the force of this reasoning, General Accident musters a plethora of counter-arguments. We have carefully examined this asseverational array. We conclude that none of these counter-arguments carries the day.

26
We start with General Accident's contention that its policy and Lexington's must be read together as a part of a comprehensive, integrated insurance program. This may be true from Blank Rome's standpoint, but there is nothing in the record that justifies a conclusion that all four excess policies were written to follow the form of General Accident's underlying policy in all respects. The record merely shows five separate policies, independently issued. Each of the four excess carriers had the opportunity to write its own policy, and the ensuing policies were differently phrased. Each was subject to its own set of exclusions, exceptions, and limitations. It cannot be said that these policies uniformly follow the form of General Accident's policy. Consequently, General Accident's attempt to portray them as carbon copies is wholly unconvincing.

27
Next, General Accident points to the settlement and defense provision within Lexington's policy. That provision creates an option for participation in the insured's defense.3 General Accident twists this option like a pretzel and treats it as an obligation. Building on that shaky foundation, General Accident insists that the settlement and defense provision is incompatible with Lexington's present position. This is palpably incorrect.

28
The authority upon which General Accident relies does not assist its cause. To support its anfractuous reasoning, General Accident cites the decision in a case brought by it against one of Blank Rome's other excess insurers. See Gen. Accid. Ins. Co. v. Am. Ins. Co., 2000 WL 92097 (E.D.Pa. Jan.27, 2000). Fairly read, this decision strengthens, rather than weakens, Lexington's hand. Like Lexington's policy, American's policy provided specific conditions that had to be met before a duty to defend would arise. Id. at *5. The district court awarded summary judgment to American because these conditions had not been satisfied (and, thus, the contractual language of American's policy did not give rise to an obligation to contribute to the costs of Blank Rome's defense). Id. The court also found that principles of equity did not allow it to ignore the plain language of American's policy in order to impose a reimbursement obligation that American had never committed itself to undertake. Id. This rationale is fully transferable to the case at bar. The result, therefore, should be the same.

29
General Accident derives an additional argument from the sprawl of previous litigation between it and Blank Rome's other excess insurers. This time, the emphasis is on the decision in Gen. Accid. Ins. Co. v. Safety Nat'l Cas. Corp., 825 F.Supp. 705 (E.D.Pa.1993). We are satisfied that this emphasis is misplaced.

30
In Safety National, the district court held that one of Blank Rome's second-layer excess insurers was obliged to pay General Accident a pro rata share of the defense costs that General Accident had incurred. See id. at 711. The court premised its decision on the fact that Safety National's policy not only incorporated all the terms of General Accident's primary policy (including the apportionment of claims provision) but also said nothing about the matter of defense costs. Id. at 708. This is a far cry from the scenario that confronts us, in which (a) Lexington's policy does not blindly follow the form of the underlying policy, and (b) Lexington took pains to protect itself against any obligation to pay defense costs. Indeed, the Safety National court, in a subsequent decision denying reconsideration, acknowledged that it would have been a different case had Safety National issued a policy along the lines of Lexington's. See Gen. Accid. Ins. Co. v. Safety Nat'l Cas. Corp., 1993 WL 372279, at *5 n. 3 (E.D.Pa. Aug.30, 1993) (noting that "had Safety National intended a different result, it could have simply issued an endorsement stating that its policy would follow only the terms and conditions of other excess policies, such as Lexington's").

31
The final weapon in General Accident's armamentarium is an asseveration that it is entitled to reimbursement under the doctrine of equitable contribution. Broadly stated:

32
Equitable contribution is ... the right to recover ... from a co-obligor who shares such liability with the party seeking contribution. In the insurance context, the right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others.... Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was equally and concurrently owed by the other insurers.

33
Truck Ins. Exch. v. Unigard Ins. Co., 79 Cal.App.4th 966, 974, 94 Cal.Rptr.2d 516 (2000); see also Hartford Cas. Ins. Co. v. Argonaut-Midwest Ins. Co., 854 F.2d 279, 283 (7th Cir.1988). The right of equitable contribution does not depend on an express agreement between the parties to indemnify each other, but, rather, rests upon equitable principles that imply an obligation to contribute ratably toward the payment of a common obligation. Ohio Cas. Ins. Co. v. State Farm Fire & Cas. Co., 262 Va. 238, 546 S.E.2d 421, 423 (2001). Neither Pennsylvania nor Massachusetts has definitively adopted this doctrine in the insurance context.4

34
We need not prophesy what treatment the doctrine will receive in these two jurisdictions. For present purposes, it suffices to say that there is no support in the case law of any jurisdiction for the proposition that, in the absence of exceptional circumstances, the doctrine of equitable contribution can override explicit, unambiguous policy language. See Tex. Employers Ins. Ass'n v. Underwriting Members of Lloyds, 836 F.Supp. 398, 408 (S.D.Tex.1983) (refusing to apply equitable contribution doctrine where doing so "would fly in the face of unambiguous policy language"); Truck Ins. Exch., 79 Cal. App.4th at 974, 94 Cal.Rptr.2d 516 (stating that courts ordinarily "should not impose an obligation on an insurer that contravenes a provision in its insurance policy"). That is consistent with the hallowed principle that, absent some amphiboly, a court cannot, in the name of equity, rewrite the language of an insurance contract. See Williams v. Nationwide Mut. Ins. Co., 750 A.2d 881, 885 (Pa.Super.2000); Hakim v. Mass. Insurers' Insolv. Fund, 424 Mass. 275, 675 N.E.2d 1161, 1164 (1997).

35
To say more on this point would be supererogatory. There are no exceptional circumstances here and Lexington's policy is unambiguous in respect to defense costs. Thus, the doctrine of equitable contribution does not come into play.5

36
We need go no further. For the reasons stated above, we hold that Lexington has no obligation to pay any portion of the defense costs incurred by General Accident in defending Blank Rome. Accordingly, the district court did not err in granting summary judgment in Lexington's favor.

37
Affirmed. COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED

Notes:

*
Of the District of Massachusetts, sitting by designation

1
At that time, Blank Rome entered into an agreement with the five insurers. The agreement provided, in substance, for each insurer to contribute its policy limit to Blank Rome in exchange for a release of any and all further liability (including, but not limited to, defense (including, but not limited to, defense costs)

2
To be sure, absent the exchange of releases Blank Rome might have been responsible for the balance of the costs — but that determination is well outside the proper purview of this action

3
The settlement and defense provision reads in pertinent part:
Anything in the Underlying Insurance to the contrary notwithstanding, the Company shall not be obligated to assume charge of the settlement or defense of any claim or suit brought or proceeding instituted against the Insured, but the Company, at its option but not being required to, shall have the right and be given the opportunity to associate with the Insured in the defense or control of any claim, suit or proceeding which appears reasonably likely to involve the Company, in which event the Insured and the Company shall cooperate in all things in the defense or control of such claim, suit or proceeding.

4
In Massachusetts, however, the Commonwealth's intermediate appellate court has indicated a willingness to entertain such an actionSee Rubenstein v. Royal Ins. Co., 44 Mass.App.Ct. 842, 694 N.E.2d 381, 388 (1998) (suggesting that "there is no bar against an insurer obtaining a share of indemnification or defense costs from other insurers under the doctrine of equitable contribution").

5
We note, as an aside, that "[i]n the context of insurance coverage, proof that the policies insure the same property is not sufficient to establish a common obligation; the policies in question must afford coverage for the same insureds and the same risk."Ohio Cas., 546 S.E.2d at 423. Using this logic, some courts have held that the doctrine of equitable contribution does not pertain as between a primary insurer and an excess insurer. E.g., Home Indem. Co. v. Gen. Accid. Ins. Co., 213 Ill.App.3d 319, 157 Ill.Dec. 498, 572 N.E.2d 962, 963 (1991) (noting that primary and excess policies perforce cover different risks). We decline to address that question here.
Michael K. Loucks, Assistant U.S. Attorney, with whom Michael J. Sullivan, U.S. Attorney, and Susan G. Winkler and Gary S. Katzmann, Assistant U.S. Attorneys, were on brief for the United States.
Matthew D. Brown, with whom Joseph P. Russoniello and Cooley Godward LLP were on brief for Thurston.
Before Lynch, Lipez, and Howard, Circuit Judges.
LYNCH, Circuit Judge.
A jury convicted William Thurston, a vice president of Damon Clinical Testing Laboratories, Inc., of conspiring to defraud the Medicare program of over five million dollars. The fraud charged involved the manipulation of physicians into ordering unnecessary ferritin blood tests1 for Medicare beneficiaries, in violation of 18 U.S.C. § 371 (2000).
The essence of the scheme charged was that Damon, through Thurston and others, bundled the ferritin blood test — previously ordered by doctors less than two percent of the time — into a panel of blood tests known as the LabScan — which was ordered thirty to forty percent of the time. When doctors or patients (instead of insurers) paid for the bundled LabScan, Damon provided the ferritin test for free, leading doctors to believe there was no extra charge for this test. Doctors were not told that, when Medicare paid for the bundled LabScan, Medicare was charged extra for the ferritin test. Indeed, both a letter and marketing materials indicated the added ferritin test was "free"; that is, that there was no charge beyond the standard LabScan charge. Those unnecessary ferritin tests were not free to Medicare. Damon charged Medicare roughly $21 per ferritin test on top of the approximately $24 charged for the LabScan. Nor were doctors told that the ferritin test could be ordered separately; the test requisition form did not offer that option. The physicians, then, were induced to order and to certify as medically necessary a large number of ferritin tests which were not medically necessary.
The government's theory was that Damon did this to offset Medicare's 1988 reduction in reimbursement rates of sixteen percent, which was projected to cause Damon an estimated annual loss of $800,000 in revenues. In just one of Thurston's labs, the orders for ferritin tests were expected to increase from approximately three hundred per month to roughly ten thousand per month. Thurston testified that he was innocent, and neither had knowledge of nor responsibility for key components of the conspiracy. The jury disagreed.
Although the sentencing guidelines called for a sentence of sixty-three to seventy-eight months, the district court sentenced Thurston to only three months' imprisonment. It did so by granting a downward departure to "correct" a perceived disparity between a five-year sentence of imprisonment for Thurston and the sentence of three years' probation given to the company President, Joseph Isola, who had pled nolo contendere and assisted the government. Its second ground for departure was its sense that the good works Thurston did for his church and community were extraordinary.
This sentence outraged the prosecutors, who appealed, arguing that the district court lacked the power to depart downward for any of the reasons it gave, and that, even if a departure were appropriate, the extent of the departure was excessive. The government also appeals the district court's failure to impose a fine, on the basis that the Sentencing Guidelines, if not the statute, mandated a fine. Finally, the prosecution argues that if some departure for good works was warranted, the district court was required to address an issue it avoided: the government's request for an upward departure on the basis that Thurston had obstructed justice by committing perjury on the witness stand.
Thurston also appeals, arguing that the conviction must be vacated because the prosecution was barred by the statute of limitations, because he was entitled to a jury instruction and to acquittal on the basis that he reasonably interpreted the law to mean he could rely on the physicians' certifications of medical necessity, and because of other errors. In addition, Thurston argues his sentence was too high because the sentencing base offense level calculation for amount of loss, either actual or intended, was unproven and excessive. Thurston also defends the downward departure.
Several important issues are raised by these appeals. The government's appeal requires us to address the effect of the new Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 (PROTECT Act), Pub.L. No. 108-21, 117 Stat. 650,2 on the standard the courts of appeals use to review downward departure decisions by district judges in sentencing, as well as the availability of a downward departure for a record of good works, U.S.S.G. § 5H1.11. Thurston's appeal invites, inter alia, clarification of the defense doctrine concerning a defendant's reasonable interpretation of the law; the issue of when a statute of limitations defense must be raised; the ramifications of a trial judge's failure to respond to jury instructions proposed by counsel; the evidence needed to show an intended loss; and the question of whether fines are mandatory.
In the end we sustain the conviction but find the sentence was in error.
I. Facts
We state the facts as the jury could reasonably have found them, including a fair description of the defense evidence.
A. Background
Medicare provides certain medical services and care, including clinical laboratory testing services, to persons aged sixty-five and older and to persons with disabilities. At the time of the conspiracy, Medicare was administered by the Health Care Financing Administration (HCFA), a division of the U.S. Department of Health and Human Services. HCFA in turn contracted with private insurance companies ("carriers" and "intermediaries") to handle claims for reimbursement to Medicare program beneficiaries. By law, Medicare only reimburses clinical laboratory services if those services were medically necessary for the treatment or diagnosis of a beneficiary's illness or injury. 42 U.S.C. § 1395y(a)(1)(A) (2000); see also 42 C.F.R. § 424.10(a) (1988). Medicare did not generally reimburse screening tests. Medicare reimbursed one-hundred percent of the cost of necessary clinical blood tests.
Damon was, at the time, a Massachusetts corporation that provided clinical laboratory testing services to physicians, hospitals, health maintenance organizations, and their patients nationwide. Approximately thirty percent of Damon's revenues were from Medicare. Damon owned and operated a national system of clinical laboratories, and Damon was an approved Medicare provider. When Damon billed the Medicare program, it submitted to the carriers a HCFA 1500 form saying that it certified the lab tests were medically necessary. Physicians did not see those bills.
Thurston served as Regional Vice President of Damon from 1987 to 1990, and was responsible during all or part of this time for Damon's regional laboratories in Newbury Park, California; Phoenix; Chicago; and San Francisco. His office was at the Newbury Park lab; he traveled to the other labs and was in regular phone contact. Thurston was promoted to Senior Vice President of Operations in 1990. Thereafter, he relocated to the company headquarters in Needham, Massachusetts and supervised only the San Francisco lab. Another company purchased Damon in August 1993; Thurston later switched employers and moved to Utah.
B. Theories of Prosecution and Defense
The government's theory was that the defendants tricked doctors into ordering medically unnecessary tests, for which Medicare paid. Damon added little-used tests to more popular panels of tests; it then tricked doctors by concealing that the panels could be ordered without the added tests and that Medicare was being charged for the tests. To conceal from doctors that Medicare was being charged, and to encourage doctors to order ferritin tests regardless of medical necessity, the defendants charged doctors and patients little or no extra fee for the added tests; provided literature saying that ferritin was provided free; otherwise failed to disclose to doctors the cost to Medicare of the expanded LabScan; and made it difficult to order the bundled test without ferritin.
The defense theories were that there was no conspiracy and, if there were, then Thurston was not a knowing participant. The defense contended that Damon complied with existing Medicare regulations, which neither prohibited bundling nor imposed a requirement on the lab to disregard a physician's certification that tests were medically necessary. It further argued that even if Thurston's interpretation of the regulations was incorrect, it was objectively reasonable, and so Thurston lacked the required criminal intent. Thurston's defense was also that any fraud was carried out by his subordinates, without his knowledge. He testified that he did not instruct the labs to add ferritin; did not authorize or condone any decision to forego a fee increase for doctors or private-pay patients on the expanded LabScan; did not instruct subordinates to conceal that doctors could order a LabScan without ferritin; and had nothing to do with requisition forms or particular pieces of marketing literature.
C. Evidence of Conspiracy to Defraud

1
Addition of Ferritin
In late 1987, HCFA announced that effective April 1, 1988, Medicare would reduce by almost sixteen percent the fees paid to laboratories, including Damon, for providing clinical laboratory services to beneficiaries. If Damon maintained its existing practices and fee structure, then Damon would lose $800,000 in revenues during the first year alone, as Thurston knew. Of that amount, more than $500,000 of the annual losses would occur at Thurston's four regional laboratories.
There were corporate discussions, which included Thurston, about how to offset this loss. As a result, Damon added its ferritin test to the LabScan, a panel of more than a dozen blood chemistry tests performed by a single machine on one blood sample. The ferritin test was performed on separate equipment. Damon bundled ferritin with the LabScan from 1988 to at least mid-1993. The LabScan had been requested on at least thirty-five to forty percent of the orders submitted to Thurston's regional laboratories. By contrast, doctors rarely ordered the ferritin test. The general manager of one of the laboratories Thurston oversaw estimated that only one to two percent of the orders for blood tests included a request for a ferritin test.
Nothing in the medical literature at the time showed ferritin was necessary for all persons receiving LabScans. Indeed, it was not. A family practitioner testified that he needed ferritin less than ten percent of the time it was included as part of the LabScan. Similarly, an internist testified that he needed the ferritin test for very few of his Medicare patients.
The plan to add ferritin to the LabScan was discussed at a general managers meeting in January 1988 and at a mid-year financial meeting for the western region in March 1988. Thurston attended both meetings. In late March, Thurston personally approved the addition of ferritin to the LabScans offered by the Newbury Park, San Francisco, and Phoenix labs.3 Thurston initially acquiesced when the Phoenix lab sought permission not to add ferritin; in August 1988, however, after Thurston saw the financial results from the addition of ferritin at his other labs, Thurston ordered the Phoenix lab to add the test to the LabScan.
Thurston presented evidence that the decision to add ferritin was made at a lower level for legitimate reasons. Thurston and Isola testified that at the general managers meeting in early 1988, management decided to allow individual laboratories to determine whether to add ferritin to the LabScan. There was also testimony that Damon's sales force made requests to the sales managers and general managers of individual labs to add ferritin to the LabScan, on the grounds that the new test would make the panel more competitive.

2
Differential Charging for Ferritin Test
a. Thurston's Knowledge of Price Differential
Medicare provided one reimbursement for the ferritin test and a separate reimbursement for the LabScan panel. In 1988, for example, Medicare paid $24.05 for a LabScan and $20.86 for a ferritin test.
Thurston's labs submitted to him capital expenditure requests (CERs) to help with the decision whether to bundle the tests. CERs were financial projections comparing the additional revenues (from Medicare reimbursements) and costs (partly from the purchase of new equipment) that would result from the addition of ferritin to the LabScan.4 These CERs assumed there would be no increase in the charge to doctors and patients for a LabScan with ferritin. Thurston discussed and then signed the CERs. They projected losses of revenue from doctors and patients (who would receive free ferritin tests) and massive increases in revenue from Medicare reimbursements. One lab, for example, projected that the number of ferritin tests performed for Medicare beneficiaries would grow from 25 per month to 1,946 per month — increasing revenues by $10,308 per month. Overall, Thurston's labs projected that they would increase their Medicare reimbursements by approximately $1.16 million per year by adding ferritin to the LabScan; if multiplied by five years, this increase would be $5.8 million. The capital expenditure requests were best-case projections, assuming that every doctor who would otherwise have ordered a LabScan without ferritin would now order a LabScan with ferritin.
Damon sought reimbursement (at different rates) for ferritin tests from Medicare, CHAMPUS,5 and other insurers, but provided them for free to doctors and patients. Thurston said he was unaware doctors were not being charged. But Thurston approved the decision by a number of his labs to adopt this policy of differential pricing depending on the client, and the CERs assumed no price increase for doctors and patients. Thurston instructed a subordinate to add ferritin at no charge to doctors; Thurston was present at a meeting in which another executive announced the no-charge policy; and Thurston received a memo saying that there was no price increase for doctors at a lab he oversaw. Witnesses testified that physicians are highly price-sensitive about charges for lab work and might object to the automatic inclusion of ferritin unless the test were provided for free. At least initially, many or all of Thurston's labs increased the charge to private insurance companies for a LabScan based on the addition of ferritin. However, any price increase for private insurers on the expanded LabScan was much smaller than the cost increase to Medicare.
Thurston presented evidence that two of his labs did increase the price for physicians; that this price increase provoked complaints by doctors; that he was informed of these complaints; and that he responded that doctors could not obtain a LabScan with ferritin unless they paid the higher price. He also presented evidence that the no-charge approach was a deviation from corporate policy and was initiated by the heads of individual labs; that he did not find out about any price differential until years after it had been implemented; and that he sought to correct any price differential as soon as he discovered it. Thurston testified that he did not authorize, condone, or ratify a decision not to increase the price of the LabScan based on the addition of ferritin.
b. Concealing Price Differential from Doctors
Thurston's labs took steps to conceal from doctors that, in addition to the LabScan charge, Medicare would pay an extra fee for the ferritin tests. No letters were sent to doctors advising them that Medicare would be charged separately for the ferritin test. To the contrary, in April and May 1988, letters were sent to physicians notifying them that the ferritin test was going to be automatically added at "no extra cost." In Newbury Park, stickers were also printed and added to physicians' brochures and directories saying, "Ferritin Automatically Included at No Charge." Of course, as to Medicare patients, these statements were untrue.
Thurston testified that he did not pre-approve the letters or stickers saying ferritin would be provided free to customers. Thurston portrayed himself as a hands-off manager who trusted subordinates to build in a charge to physicians and to accurately promote the expanded LabScan.
Several physicians testified they were initially unaware that Damon charged Medicare for the ferritin component of the expanded LabScan. A number of Damon customers protested, and even switched labs, when they belatedly discovered Damon was charging Medicare for ferritin tests conducted as part of the LabScan. When doctors told Damon sales representatives that they did not need the additional test, some were told that a LabScan without ferritin would cost more than a LabScan with ferritin. A major client referred Damon to a newspaper article criticizing the practice of bundling tests into panels and profiles, and warned Damon that its failure to educate doctors about the composition of and alternatives to its panels would subject it to ongoing criticism. Thurston was informed of these complaints, which were written up in monthly management reports he received in 1989 and 1990. Despite these complaints, Thurston did not cause a letter to be sent to doctors informing them of the extra charge for ferritin to Medicare.
Damon also collaborated with HMOs operating on a capitation basis (i.e., paying a flat monthly fee for each HMO member) to reduce utilization of bundled tests such as the LabScan. For example, one of Thurston's labs added to its HMO requisition form a checkbox for a LabScan without ferritin. Damon made no such effort to assist Medicare.

3
Availability of LabScan Without Ferritin
Thurston instructed subordinates to take specific steps that hid the fact that the LabScan could be ordered without ferritin and made it difficult for doctors to order the LabScan separately. For example, Thurston told the general manager of the Newbury Park lab not to advertise or promote the fact that doctors could still order a LabScan without ferritin. Similarly, Thurston helped make the decision to omit, from the Newbury Park letter announcing to doctors the addition of ferritin to the LabScan, the test code for ordering a LabScan without ferritin. The standard requisition forms used by Thurston's labs did not change following the addition of ferritin to the LabScan; there was a checkbox for the "LabScan" (which now included ferritin) but no box for the "LabScan without ferritin" or the "LabScan with ferritin."
During the conspiracy period, there were at least two ways for doctors to order the LabScan without ferritin. They could handwrite such an order on a standard requisition form, or they could request and obtain a customized requisition form with a checkbox for the LabScan without ferritin. A number of doctors and institutions took advantage of these options.
Thurston testified that he did not tell anyone to conceal or refrain from advertising that the LabScan could be ordered without ferritin. There was testimony that, after Thurston learned in 1991 that the front of a requisition form used by one of his labs did not disclose the inclusion of ferritin in the LabScan, he instructed a subordinate to list it on the front and the form was so amended.

4
Apolipoprotein
Damon also added an apolipoprotein test to its coronary risk panel in 1989. Before apolipoprotein was added to the panel, clients ordered it very rarely. The standard requisition forms Damon used after adding apolipoprotein to the panel also did not offer a checkbox for a coronary risk panel without apolipoprotein. Following the addition of apolipoprotein, the cost to doctors of the coronary risk panel increased by five dollars. Medicare reimbursed apolipoprotein separately at a rate well above five dollars. Thurston participated in the decisions about the addition, the requisition forms for, and the extra charges for apolipoprotein.
D. Thurston's "Reasonable Interpretation" as Evidence of Lack of Criminal Intent
Thurston presented evidence that from 1988 to 1993 it was an industry-wide practice for labs to rely on the doctors who ordered tests to make determinations of medical necessity. Because, prior to 1994, doctors did not normally share their diagnoses with labs, labs did not have the information required to gauge medical necessity. Damon employees did not believe that they certified tests as medically necessary when they submitted HCFA 1500 forms with Medicare bills. Instead, they believed it was the doctors who ordered LabScans who made the certification.
Two expert witnesses testified that it was appropriate in 1988 to include ferritin in a blood chemistry panel. The bundling of different tests into panels was lawful under Medicare regulations. There was testimony that technological changes during the 1980s made it possible to automate the ferritin test, which presumably made it much cheaper to conduct. Witnesses for both sides testified that by 1988 some of Damon's competitors offered ferritin as part of their blood chemistry panel and so Damon added the test to stay competitive.
II. Procedural History
A. Indictment and Trial
On January 22, 1998, a thirty-nine paragraph single-count indictment charged Thurston and three other former Damon executives — Joseph Isola, Beno Kon, and Gerald Cullen — with conspiring to defraud HCFA in violation of 18 U.S.C. § 3716 by causing doctors to order unnecessary tests by adding a test for ferritin to a pre-existing panel of diagnostic blood tests, and by adding a test for apolipoproteins to a profile used to assess coronary artery disease. The conspiracy period was from July 1987 to August 1993.
Isola, President of Damon, pled no contest and, pursuant to his plea agreement, was sentenced to three years' probation and a one-hundred dollar special assessment. Kon, Corporate Controller, died during the proceedings. Cullen, Senior Vice President for Operations, was tried before the district court in October 2001 and acquitted at the close of the government's evidence. In addition, Damon pled guilty on October 11, 1996 to conspiracy to defraud by bundling ferritin with the LabScan and apolipoprotein with the cardiac risk panel. The company was sentenced to pay a $35,273,141 fine, and later entered into a civil settlement under which it paid the United States and the state Medicaid programs an additional $83,756,904.
Thurston was tried before a jury in November and December 2001. The trial lasted three weeks. At the close of the government's evidence, the district court granted Thurston's motion for judgment of acquittal as to the indictment's apolipoprotein allegations, ordered these allegations stricken, and explained to the jury that only the ferritin allegations remained. The jury found Thurston guilty. Thurston's subsequent motions for judgment of acquittal and for new trial were denied. The procedural rulings at trial which Thurston attacks are described below.
B. Sentencing
The district court sentenced Thurston to three months' imprisonment (with a judicial recommendation that the term be served in a halfway house), followed by twenty-four months of supervised release (of which the first three months were to be served in home detention). The court imposed a one-hundred dollar special assessment and no fine. The Pre-Sentence Report (PSR) had recommended a Total Offense Level of twenty-six and a Criminal History Category of one. The PSR identified the base offense level as six. It recommended a fourteen-level upward enhancement for an intended loss of at least five million dollars; a two-level enhancement for more than minimal planning; and a four-level enhancement for a leadership role. It also suggested that an enhancement for obstruction of justice was appropriate, on the grounds that Thurston perjured himself at his trial. The PSR recommended the statutory maximum term of sixty months' imprisonment and noted that both the statute and the guideline allowed for a fine. It calculated that Thurston had a net worth of $1,526,904.
The defense contested the PSR's recommendations. Thurston requested a three-level decrease because the substantive offense of defrauding the United States was incomplete; a four-level decrease because Thurston was a minimal participant; and a two-level decrease for acceptance of responsibility. Thurston requested a downward departure on the grounds that he had an extraordinary record of charitable work and community service; that the offense constituted aberrant behavior; and that there was the potential for a large disparity with Isola's sentence.
The government argued that Thurston should receive a two-level upward enhancement for obstruction of justice. Otherwise, it accepted the recommendations of the PSR. The parties agreed that any restitution had been made by Damon, the corporate defendant.
The district court sentenced Thurston at a hearing on June 26, 2002 to three months' imprisonment, a period of supervised release, and no fine. The district court granted a fourteen-level enhancement for the size of the intended loss, see U.S.S.G. § 2F1.1(b)(0) (1992 version),7 a four-level enhancement for an aggravated role in the offense, see U.S.S.G. § 3B1.1(a) (1992 version), and a two-level enhancement for more than minimal planning, see U.S.S.G. § 2F1.1(b)(2) (1992 version). The court did not explicitly rule on the government's request for an obstruction of justice enhancement, see U.S.S.G. § 3C1.1 (1992 version), or Thurston's request for a three-level decrease for failure to show completion of the substantive offense, see § 2X1.1 (1992 version). Thurston's adjusted offense level of twenty-six and criminal history category of one yielded a guidelines sentencing range of sixty-three to seventy-eight months' imprisonment; this range was trumped by the statutory maximum of sixty months for a violation of 18 U.S.C. § 371.
During the hearing, the government confirmed that Thurston had been offered (and had rejected) a plea agreement "along the lines" of the one that Isola had accepted. Over the government's objections and arguments, the district court then departed downward on the basis of Thurston's record of charitable work and community service and the disparity between Thurston's and Isola's sentences. The court then solicited the government's recommendation about the extent of the departure. The government responded that, if the court chose to depart, then it should depart no further than the sentencing guidelines for a perjury conviction, which would be an offense level of twenty (six less than that of the underlying offense), for a sentencing range of thirty-three to forty-one months' imprisonment. The court then departed by at least sixteen levels.
The government appealed the sentence and Thurston appealed his conviction and sentence.
III. Thurston's Appeal from his Conviction
Thurston was convicted under 18 U.S.C. § 371, which provides:
If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.
A. Statute of limitations
Thurston argues that the trial court erred in not granting his post-verdict Rule 29 motion for acquittal, because the government had not proved an overt act during the limitations period, and in not sua sponte instructing the jury on the statute of limitations.
The statute of limitations for 18 U.S.C. § 371 crimes is the general five-year statute of limitations contained in 18 U.S.C. § 3282. Here, that five years ran back from January 22, 1998, the date of the indictment, less the six weeks during which Thurston agreed to toll the limitation period. The government, therefore, had to prove an overt act was done on or after December 11, 1992.
The indictment properly alleged at least eight overt acts within the limitations period.
Thurston did not raise the defense of statute of limitations either before or at trial, did not request an instruction on the defense, and did not object when the judge instructed without addressing the issue. Thurston first raised the issue by Rule 29 motion after the verdict. The government says Thurston raised the issue too late. There is a preliminary question of when such a motion should be raised, a question affecting our standard of review.
"The statute of limitations is a defense and must be asserted on the trial by the defendant in criminal cases...." Biddinger v. Comm'r of Police, 245 U.S. 128, 135 (1917). Here the indictment adequately pled facts to establish that the crime was within the limitations period. Thurston was not required to raise the defense before trial under Rule 12(b)(3), Fed.R.Crim.P. Nor would it have made sense for him to do so, since the defense depended on what the government proved or failed to prove at trial. In a criminal case a defendant need only plead as to the accusation of guilt in the indictment and need not raise the statute of limitations as an affirmative defense before trial.8 Thurston mistakes these truisms for an argument that he need not raise the limitations defense at all before the jury delivers a verdict of guilt.
The government says Thurston has waived9 the issue and may not raise it at all. Absent an explicit agreement to waive the defense, we treat the issue as a forfeiture and not a waiver, contrary to the government's argument. This was not an intentional relinquishment or abandonment of a known right, the definition of a waiver. The issue of failure to assert the defense was viewed as forfeiture in United States v. O'Bryant, 998 F.2d 21, 23 n. 1 (1st Cir.1993). The rule we use — that the defense of statute of limitations must be raised at trial and, if not, is forfeited but not waived — is the rule in most circuits. See United States v. Ross, 77 F.3d 1525, 1536 (7th Cir.1996) ("[I]t is widely accepted that a statute of limitations defense is forfeited if not raised at the trial itself.") (citing cases).
Thurston has indeed forfeited10 the defense that the government did not prove facts that an overt act occurred within the limitations period. The defense should have been raised at trial. Waiting until after the jury has rendered a verdict of guilt to raise a limitations defense for the first time is inconsistent with the characterization of the statute of limitations as an affirmative defense and would unfairly sandbag the government.
Because this was a forfeiture and not a waiver, there is still plain error review available under Rule 52, Fed.R.Crim.P. United States v. Olano, 507 U.S. 725, 731-32 (1993). Our conclusion is straightforward. The government's evidence established overt acts by the conspirators within the limitations period, so there was no error at all as to the statute of limitations, much less plain error.
The government showed that labs overseen by Thurston (and his co-conspirators) submitted tens of thousands of reimbursement claims to Medicare after December 11, 1992 for ferritin tests conducted as part of LabScan orders. The government also presented ample evidence that many of these tests were medically unnecessary and were submitted by doctors unaware that Medicare would be charged separately for ferritin.11 It was not credible that the ferritin test, ordered less than two percent of the time, suddenly became medically necessary thirty to forty percent of the time within the life span of the conspiracy.
Thurston also argues he was entitled to a jury instruction on the limitations point. By failing to request a jury instruction and failing to object to the lack of an instruction, he has forfeited the argument. Fed.R.Crim.P. 30; see United States v. Gallant, 306 F.3d 1181, 1187 (1st Cir.2002) ("[A] party unhappy with a trial court's jury instruction [must] promptly state the precise objection after the instruction has been given."). As there was no error, the plain error standard was not met. See Fed.R.Crim.P. 30, 52(b).
B. Purported Lack of Criminal Intent and the Requested Reasonable Interpretation Regulation
Procedurally, the issue of reasonable interpretation comes up in two ways: denial of Thurston's Rule 29 motions and denial of his request for a jury instruction. Thurston's three Rule 29 motions — at the end of the government's case, at the end of the defense case, and after the verdict — all argued that he lacked the needed criminal intent. Our review is of whether a rational fact finder could conclude, beyond a reasonable doubt, that the government proved the elements of the crime, including intent. United States v. Moran, 312 F.3d 480, 487 (1st Cir.2002). Thurston also requested a jury instruction on reasonable interpretation of the law12 and preserved his objection to the court's rejection of the instruction.
Thurston argued he reasonably interpreted the law as requiring that the treating physician, not the test lab, certify to the HCFA that the test ordered was medically necessary and reasonable, and that he and the company were entitled to rely on that physician certification. Specifically, Thurston contended that in the relevant time period an independent clinical lab did not violate any aspect of Medicare law by: (1) providing physicians with a panel containing a ferritin test, so long as the physician was given reliable and accurate information about the test and could select the panel without the test; or (2) submitting a reimbursement claim, using a HCFA form or otherwise, so long as a physician ordered the test performed. This is one of his primary arguments on appeal.
Whether a particular defense doctrine is germane depends on the crime charged and the facts of the case. This is where Thurston's argument falters. He argues that he could not have had the needed intent because employees of clinical labs, including Thurston, "were unaware that they were actually certifying the medical necessity of each test performed for every patient" and they could reasonably interpret the law to mean that the treating physician, not the laboratory, made the certification. The argument is beside the point.13
Thurston was not charged with making a false statement to the United States, the falsity of which turned on an ambiguity in what the law required. Nor was he charged with failing to make a statement required by law in a situation of parallel ambiguity. He was not charged with falsely certifying the medical necessity of the tests ordered. He was charged with the crime of conspiracy to defraud the United States by inducing physicians through deceit and trickery into certifying tests as medically necessary when the ferritin tests were not necessary, thus leading Medicare to pay for unnecessary services.
Thurston's knowledge of the Medicare regulations and of the fact that the ordering physicians would certify the medical necessity of the tests was, ironically, part of the proof of the crime, not a defense. Thurston cannot, under 18 U.S.C. § 371, knowingly conspire to mislead and manipulate doctors into certifying medically unnecessary tests which led to improper payment of Medicare funds and then defend on the basis that he committed no fraud because the doctors, not he, were the ones who certified the tests as necessary.
Thurston's reliance on United States v. Prigmore, 243 F.3d 1 (1st Cir.2001), is misplaced. Prigmore is part of a line of cases charging false statements or failure to make required statements, holding that intent should be measured against an objectively reasonable understanding of the legal requirements to be met, and that a statement is not in fact false or fraudulent if it is based on an objectively reasonable interpretation of that legal requirement. See id. at 17-18. This court first applied this principle in United States v. Rowe, 144 F.3d 15, 21-23 (1st Cir.1998), to a statement that was not in fact false under an objectively reasonable interpretation of a disclosure requirement. In Prigmore, the conspiracy charged was to defraud and impair the functioning of the Food and Drug Administration, in connection with its oversight and regulation of medical devices, through failure to file reports which were required under certain conditions. The fraud alleged was the failure to submit a pre-market approval information supplement to the FDA, but whether such a supplement was required depended on the interpretation of certain regulations. The same conditional requirement was true of certain testing reports. The question was whether defendants could objectively and reasonably understand one regulatory phrase, "affecting the safety or effectiveness of the device," as being circumscribed by another regulatory phrase, "intended ... conditions of use." See 243 F.3d at 15.
No similar question was presented here. Here, the underlying crime was one of manipulating doctors into making false certifications so Damon could receive unwarranted Medicare payments. There is no material question about ambiguity in the underlying legal requirements and no germane question about the meaning of the law. There was also no issue of lack of fair notice of what the law requires, a concern underlying the Prigmore/Rowe line of cases. A reasonable person knows it is wrong to trick others into doing something wrong which one does not do directly oneself, especially in order to obtain personal gain. The Prigmore doctrine has no application given the crimes charged and the facts involved. Because the nature of the crime charged made the reasonable interpretation doctrine irrelevant, the jury instruction issue disappears.
C. Failure of District Court to Respond To All of Thurston's Requested Instructions
Thurston argues that the district court violated Rule 30, Fed.R.Crim.P., which provides that
• In General. Any party may request in writing that the court instruct the jury on the law as specified in the request. The request must be made at the close of the evidence or at any earlier time that the court reasonably sets. When the request is made, the requesting party must furnish a copy to every other party.
• Ruling on a Request. The court must inform the parties before closing arguments how it intends to rule on the requested instructions.
Thurston is correct: the district court failed to inform the parties of how it intended to rule on each of the requested instructions before closing arguments, as required by the rule.
A description of the interactions of court and counsel sets the stage. Each side submitted extensive requests for instructions, and there were disagreements.14 The court did resolve the most serious disputes over some of the instructions (for instance, on the reasonable interpretation/Prigmore question) and told counsel these rulings before closing argument. The court did not, though, review all of the requests. Thurston's counsel did not object to this silence before giving his closing.
Defense counsel did raise an issue after closing, and before the jury was instructed, that he wanted to put on record his specific objections to the government's requests. He did not say he had been prejudiced in any way by the court's failure to rule on the requested instructions before he gave his closing. The court replied that it would neither rule on nor hear argument on the proposed instructions. Rather, the court stated its understanding that the appropriate time to object was at the end of the instructions. Nonetheless, it did hear argument on the government's Request No. 8 (the compelled witness rule), and declined to give the instruction. It also heard argument on the government's proposed instructions No. 18 (conspiracy); No. 19 (unlawful objectives); and No. 22 (overt act). The only proposed defense instruction called to the court's attention was No. 24, on missing witnesses.
The district court did not, as Rule 30 requires, tell counsel before closing argument its disposition of all of the requested instructions. But counsel for Thurston had an obligation to bring this to the court's attention before the closing and did not do so.
Without addressing the issue of whether Thurston has thus forfeited the Rule 30 argument, we choose to simply evaluate whether defense counsel's closing argument was adversely affected. See United States v. Owens, 167 F.3d 739, 753 (1st Cir.1999). It was not. One telling indicium that there was no prejudice is that trial counsel did not ever say to the court he would be prejudiced if he had to proceed with his closing without knowing the court's disposition of the remaining requested instructions.
An even more telling indicium of lack of prejudice is that Thurston's appellate counsel has been unable to identify any specific areas of prejudice occasioned by the trial court's lapse. While in theory such a lapse could cause prejudice, the most that is argued here is that there was "no detailed reference to important legal concepts regarding criminal conspiracy and the state of mind by which Thurston would be judged." Appellate counsel does not identify those "important legal concepts," and we see none. As to Thurston's state of mind, the trial judge did instruct on the government's burden to show Thurston had a specific intent to participate in the conspiracy and to defraud the United States. The court instructed the jury to consider Thurston individually to determine if he willfully joined the conspiracy. The court, in turn, defined "willfully." The court also explicitly rejected Thurston's reasonable interpretation instruction, and it instructed on good faith. These circumstances belie any claim of prejudice and Thurston's claim fails.
D. Motion for New Trial Based on Dismissal of Apolipoprotein Charge
Thurston and his co-defendants were originally charged with conspiracy to commit fraud as to both the ferritin and the apolipoprotein tests. At the close of the government's case the court granted Thurston's motion for judgment of acquittal on the apolipoprotein test, struck those references from the indictment, and instructed the jury that this issue was no longer before it. The government did not thereafter refer to this issue.
Thurston now argues that the court should have granted Thurston a new trial after the jury returned because the apolipoprotein evidence irretrievably tainted the trial. The government rejoins that counsel should have raised the issue sooner.
Again, we bypass the issue of forfeiture and reject the argument that dismissal of the apolipoprotein charges tainted the proceedings. Thurston's argument that none of this evidence would have been admitted if the ferritin charges were tried alone is based on an unlikely premise. Where the evidence admitted as to a dismissed count would have been admissible as to a remaining count, the defendant has not suffered prejudice. United States v. Rooney, 37 F.3d 847, 855-56 (2d Cir.1994) (collecting cases); see United States v. Weiner, 3 F.3d 17, 22 (1st Cir.1993) (jury properly considered evidence relating to counts dismissed prior to verdict, since evidence was relevant to remaining counts).
The government would have introduced such evidence in any event as relevant to rebut central defense themes that, because Damon had such a decentralized decision-making structure, Thurston was not involved in key decisions. The apolipoprotein evidence contradicted Thurston's claims about the extent and consequences of Damon's decentralized approach to the make-up, pricing, and marketing of its panels.
There was little risk of prejudice for other reasons. The government did not mention the apolipoprotein evidence in its closing, and exhibits pertaining only to apolipoprotein were removed before the documents were submitted to the jury. Further, most of the testimony and documentary evidence in the first half of the case, before the court ruled on the Rule 29 motion, dealt with ferritin. These factors further minimized the likelihood of any taint.
Thurston's conviction is affirmed.
IV. Sentencing Appeals
A. Thurston's Appeal from Loss Calculation
Much of Thurston's guidelines sentence range (sixty-three to seventy-eight months) was driven by the loss calculation. Both the PSR and the government recommended an intended loss figure of more than five million dollars but less than ten million dollars. This resulted in a fourteen-level increase in the base offense level.
Thurston, not surprisingly, targets this loss calculation. He makes two arguments. The first is that the government was precluded by a comment to U.S.S.G. § 2F1.1 from ever relying on intended loss unless the government first established what the actual loss was and then established that the intended loss was greater. This is a pure issue of guidelines interpretation, which we review de novo. See United States v. Gonzalez-Alvarez, 277 F.3d 73, 77 (1st Cir.2002). The second argument is that the court's conclusion had insufficient factual support for a number of reasons, a contention reviewed for clear error.
The guidelines interpretation argument turns on a comment which provides:
Consistent with the provisions of § 2X1.1 (Attempt, Solicitation or Conspiracy), if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss.
U.S.S.G. § 2F1.1, cmt. n. 7 (Fraud and Deceit).
Thurston argues that because the government did not show actual loss, it cannot turn to intended loss. The argument is simply wrong as a matter of the wording of the comment. The comment directs the use of an intended loss figure when it is greater than the actual loss figure; the comment does not restrict the sentencing court's ability to rely on intended loss when there is no actual loss calculation available. Defendant's reading also makes little sense: it may be easier as a matter of proof to show intended loss than actual loss. Conspirators are held accountable for the loss they intend to commit. Finally, it is obvious on these facts that the intended loss was greater than the actual loss — some doctors quit using Damon when, to their disgust, they realized what the scheme was.
Thurston next mounts a series of fact-based attacks on the intended loss figure of more than five million dollars. That figure is supported by the capital expenditure requests each of the labs prepared to obtain funding to buy the equipment needed to perform the increased ferritin testing the labs anticipated. Each CER included a financial analysis, one component of which was the estimated new revenue from bundling the tests. Thus, the intended loss calculation was based on the conspirators' own financial calculations.
Thurston argues the CERs, being mere financial projections, are not an adequate basis for an intended loss figure; that the CERs were based on an assumed best case scenario in which no physician who ordered Labscans would decline to get ferritin tests; that, in any event, not all physicians who ordered the bundled test were tricked into doing so; that the conspiracy was not proven to last five years; that the conspiracy ended before five years had elapsed for several labs, given the different dates on which the labs bundled the tests; and that later, only one lab reported to Thurston.
A number of these are quickly dispatched. The jury verdict of guilt disposes of the question of the length of the conspiracy. Thurston's promotion out of management of three of the labs is irrelevant since he earlier conspired to produce losses intended to go on for years.
Thurston also argues the intended loss had to be reduced under U.S.S.G. § 2X1.1(b)(2) because the government's proof did not establish that the conspirators had "completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense." Id. There is no merit to the argument. There was successful completion of the offense: the tests were bundled and doctors were misled into ordering unnecessary ferritin tests. The complaints from customers about Damon's practices were confirmation the scheme had worked.
The closer question is the degree of precision the government must reach in showing intended loss. It is true that the CERs set forth best case scenarios which assumed all doctors would order the bundled test without culling out the ferritin test. If the CERs stood alone, defendant would have a better argument. But they are supplemented by the fact that Damon made it extremely difficult for doctors to cull out the ferritin and order the Labscan without a ferritin test.
Further, the conspirators tried to hide from doctors the fact that there was a significant cost to Medicare associated with the bundling. The conspirators were maximizing the probability that all doctors would accept the bundling, without culling and without protest. The fact that the conspirators were not entirely successful in fooling all doctors does not lessen their intent.
We have noted before that intended loss does not have to be determined with precision; the court needs only to make a reasonable estimate in light of the available information. United States v. Blastos, 258 F.3d 25, 30 (1st Cir.2001). There was good evidence of intent and some "prospect of success" for the fraud to reap over five million dollars, and that is all that the case law requires. United States v. Orlando-Figueroa, 229 F.3d 33, 48 (1st Cir.2000). The best case CER projection was a loss to Medicare over the charged five-year life of the conspiracy of $5,800,230. It was reasonable for the district court to estimate that the intended loss exceeded five million dollars, even allowing for the one to two percent normal order rate for ferritin tests. The government met its burden and Thurston offered little in rebuttal except his protestations of innocence. There was no clear error.
B. Government's Sentencing Appeal
Given an intended loss of five million dollars, Thurston's crime led to the statutory maximum sentence of five years. The district court departed downward from the Guidelines range by sixteen levels, however, sentencing Thurston to three months' imprisonment to be followed by twenty-four months of supervised release. The court imposed no fine and recommended that the term of imprisonment be served in a halfway house.

1
Appeal from Grant of Downward Departures
The government argues that each of the stated grounds for downward departure was in error.15 First, it contends that the district court was forbidden to depart downward based on a disparity between Thurston's sentence and the sentence of the company president, a cooperating co-conspirator who pled guilty. Next, it argues that departure for good deeds is discouraged and that the facts provide no basis to warrant a finding that Thurston's good deeds are so exceptional as to make such a departure appropriate. a. Standard of Review: Effect of the PROTECT Act
On April 30, 2003, certain provisions of a new statute affecting the courts of appeals' review of sentencing provisions became effective. The PROTECT Act changes the applicable standard of review on certain issues in appeals from departures from the sentencing guidelines.
Section 401 of the PROTECT Act amends 18 U.S.C. § 3742(e), which now reads:
(e) Consideration. — Upon review of the record, the court of appeals shall determine whether the sentence —
....
(3) is outside the applicable guideline range, and
(A) the district court failed to provide the written statement of reasons required by section 3553(c); (B) the sentence departs from the applicable guideline range based on a factor that —
(i) does not advance the objectives set forth in section 3553(a)(2); or
(ii) is not authorized under section 3553(b); or
(iii) is not justified by the facts of this case; or
(C) the sentence departs to an unreasonable degree from the applicable guidelines range, having regard for the factors to be considered in imposing a sentence, as set forth in section 3553(a) of this title and the reasons for the imposition of the particular sentence, as stated by the district court pursuant to the provisions of section 3553(c);....
....
The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and, except with respect to determinations under subsection (3)(A) or (3)(B), shall give due deference to the district court's application of the guidelines to the facts. With respect to determinations under subsection (3)(A) or (3)(B), the court of appeals shall review de novo the district court's application of the guidelines to the facts.
(emphasis added).
This changed the prior law. Under Koon v. United States, 518 U.S. 81 (1996), the appellate courts were not to review a departure decision de novo, but were to ask whether the sentencing court abused its discretion.16 Id. at 91, 96-100. Where a district court grants a departure, we have, before the PROTECT Act, engaged in a three-part review: "(1) we determine whether the stated ground for departure is theoretically permissible under the guidelines; (2) if so, we examine the record to assess whether there is adequate factual support; and (3) we determine the appropriateness of the degree of departure." United States v. Bogdan, 302 F.3d 12, 16 (1st Cir.2002). Whether a stated ground for departure was theoretically permissible (part (1)) was a question of law reviewed de novo. United States v. Bradstreet, 207 F.3d 76, 81 (1st Cir.2000); cf. United States v. Diaz, 285 F.3d 92, 98-99 (1st Cir.2002) ("We review de novo whether the district court utilized a proper basis for [an upward] departure."). Under Koon, we then reviewed the remaining two parts for abuse of discretion. See Koon, 518 U.S. 96-100; United States v. Lujan, 324 F.3d 27, 31 n. 5 (1st Cir.2003); United States v. Martin, 221 F.3d 55 (1st Cir.2000).
The courts of appeals are now charged with de novo review of the second issue: whether the facts are exceptional (or outside the heartland), thus warranting consideration of a departure. Congress requires the courts of appeals to consider whether a sentence that departs from the applicable guideline range is based on a factor that:
• does not advance the objectives set forth in section 3553(a)(2); or • is not authorized under section 3553(b); or
• is not justified by the facts of the case[.]
18 U.S.C. § 3742(e)(3)(B).
Thurston argues that the PROTECT Act should not be interpreted to apply to this case and that, if it did apply, it would be retroactive and invalid. He makes two statutory intent arguments: (1) that the internal structure of the statute means it should not be applied to cases already pending on appeal; and (2) that the presumption against retroactivity should apply.
First, Thurston argues that Congress meant application of the de novo review provisions in the PROTECT Act to be deferred until appeals arise from sentences entered after the Act became effective. This is evident, Thurston says, since the Act imposed a new requirement for the district judge to give a written statement of reasons. From this, Thurston argues, all provisions of the Act were meant to apply only to post-Act sentencing. The argument is plausible, but we are unpersuaded. Even before the PROTECT Act, a trial court was required to give some reasons, though not necessarily in writing, for a downward departure. See 18 U.S.C. § 3553(c) (2000) (pre-PROTECT Act version); United States v. Sclamo, 997 F.2d 970, 973 (1st Cir.1993) (discussing discouraged ground for departure); United States v. DeMasi, 40 F.3d 1306, 1324 (1st Cir.1994) (same). A requirement that this statement of reasons be written, rather than oral, has no particular connection to the appellate standard of review.
Although the Act does not expressly say that its de novo review provision applies to pending appeals, it does give an effective date of April 30, 2003. The effective date of a statute does not by itself establish that it has any application to conduct that occurred at an earlier date. See INS v. St. Cyr, 533 U.S. 289, 317 (2001) (quoting Landgraf v. USI Film Prods., 511 U.S. 244, 257 (1994)). Still, we agree with the Eighth Circuit that the new statute applies to appeals pending as of the effective date of the statute. See United States v. Aguilar-Lopez, 329 F.3d 960, 962-63 (8th Cir.2003). Subject to constitutionally-based retroactivity concerns, it is certainly within Congress's power to change a standard of review. See, e.g., Hines v. Sec'y of Dep't of Health & Human Servs., 940 F.2d 1518, 1523 (Fed. Cir.1991); Consumers Union of U.S. v. FTC, 801 F.2d 417 (D.C. Cir.1986); cf. Bierce v. Waterhouse, 219 U.S. 320, 336-37 (1911). Much of the conduct regulated by this part of the PROTECT Act is that of the courts of appeals (and indirectly, the district courts now under closer scrutiny), and that involves conduct dating from April 30, 2003 forward.
Thurston's fall-back argument is that applying a changed standard of review to a case already on appeal would have an impermissible effect on him under the Supreme Court's retroactivity jurisprudence. See Landgraf, 511 U.S. at 264. Not so. The change of a standard of appellate review is one in procedure for the courts; procedural changes that do not affect substantial rights are not usually considered retroactive. This legislation is little different than the Supreme Court's changing the standard of review by directing the courts of appeals to decide ultimate Fourth Amendment questions by de novo review. See Ornelas v. United States, 517 U.S. 690, 697 (1996). When the Supreme Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation that must be applied "retroactively" to all criminal cases on direct review. See Harper v. Va. Dep't of Taxation, 509 U.S. 86, 95 (1993) (citing Griffith v. Kentucky, 479 U.S. 314, 322 (1987)). Changing the appellate standard of review, as done here, could upset no legitimate reliance interest by a defendant,17 could not have induced alteration of the behavior that led to the crime, and could not have upset settled expectations. We see no unfairness to defendants in Congress's requiring a closer look by appellate courts at whether a district court committed an error in deciding that the guidelines permitted a departure. It is the substance of the sentencing rules, both Guidelines and statutory, that impacts defendants.
Thurston makes a cursory argument that the PROTECT Act presents serious constitutional separation-of-powers questions. At the request of the Senate, the Chief Justice, expressing the views of the U.S. Judicial Conference, did advise the Senate of the Conference's opposition to portions of the bill, including alteration of the standard of review. See Letter from Chief Justice William H. Rehnquist to Senator Patrick Leahy (undated), available at http://www.nacdl.org/public.nsf/2cdd02b415ea 3a64852566d6000daa79/departures/$FILE/Rehnquist_letter.pdf. The U.S. Sentencing Commission requested that Congress not act until the Commission had the opportunity to analyze data and study the matter. See Letter from Judge Diana Murphy, Chair of the U.S. Sentencing Commission, et al. to Senators Orrin Hatch and Patrick Leahy (April 2, 2003), available at http://www.nacdl.org/ public.nsf/2cdd02b415ea3a64852566d6000daa79/departures/$FILE/stcg_ comm_current.pdf. But judicial opposition to legislation on policy grounds is one thing, and unconstitutionality of the legislation is another. No real theory of unconstitutionality has been presented by this appeal, and so the issue is waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir.1990).
b. Application of De Novo Standard of Review
i. Disparity With Co-Defendant
The district court felt there was an unfair disparity between a five-year sentence of imprisonment for Thurston and the three-year probation sentence for co-conspirator Isola. It viewed Isola as "the architect, at least the prime architect of this conspiracy." Apparently the district court felt that Isola, Thurston's superior, was the guiltier of the two, and that this fact overshadowed other differences between their cases. Isola pled nolo contendere to willful blindness about the apolipoprotein conspiracy.
As the law of this circuit makes clear, basing the departure on grounds of disparity in sentence alone between Thurston and Isola was beyond the district court's authority. United States v. Wogan, 938 F.2d 1446, 1448 (1st Cir.1991); see also United States v. Romolo, 937 F.2d 20, 25 n. 5 (1st Cir.1991). Sidestepping circuit precedent, the district court referred to a statute that requires a sentencing court to consider not only the Commission's Sentencing Guidelines and policy statements, but also "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). This provision was unchanged by the PROTECT Act.
Yet the same statute also requires that the court "shall impose a sentence of the kind, and within the range [of the pertinent Guidelines], unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b)(1). That is why, since as early as 1991, this court has interpreted the statute to preclude sentencing judges from departing downward based on "a perceived need to equalize sentencing outcomes for similarly situated co-defendants, without more." Wogan, 938 F.2d at 1448 (emphasis added).
The "more" that is needed refers to circumstances not adequately considered by the Commission, and none have been shown here with regard to disparity. In the pre-Guidelines era, the district court's attempt to avoid perceived unfairness would have had greater weight. The Guidelines bind us and they bind the district court. The downward departure based on disparity in sentences among co-defendants was impermissible. ii. Good Works
The second ground, based on Thurston's good works, poses the most difficult issue in the case. We have found disparity alone an impermissible ground; it is possible the trial court would not have granted so extensive a departure based on good works alone. It may also be that if the court had granted a modest departure on the second ground, the government would not have appealed. But the trial court did not differentiate and the government on appeal argues that any departure at all based on good works (like the departure for disparity) was contrary to law.
The Sentencing Guidelines discourage downward departures from the normal sentencing range based on good works — that is, civic, charitable, or public service. U.S.S.G. § 5H1.11. Such departures are permitted only when the good works are exceptional.18 See United States v. Pereira, 272 F.3d 76, 80 (1st Cir.2001). The district court based its finding that Thurston's good works were exceptional on Thurston's "record of charitable work and community service[, which is] unique, extensive and extraordinary." The court continued, "I think the record should reflect that in over fourteen years of sentencing defendants, it's my judgment that no one had a more extraordinary devotion to charitable work, community service, and especially ... to his church." Thurston is a member of the Church of Latter Day Saints, tithes ten percent of his income (as his church encourages him to do), and devotes hours every week to unpaid service with the church in a variety of positions. Letters from his fellow congregants characterize him as a man of principle and impeccable character19 — characterizations undermined, of course, by the jury's finding of guilt. In any event, it is good works, objectively measured, and not good character that is at issue.
In addition, Thurston has taken family members and others into his home and has been helpful to his neighbors. For example, the parents of a woman undergoing rehabilitation at a local medical center stayed at Thurston's home for several weeks. On another occasion, Thurston and his family laid sod for an infirm neighbor. Save for his crime, Thurston appears to have lived a creditworthy life.
The issue then becomes, as we engage in de novo review, the point of reference by which to determine whether Thurston's good works provide a basis for a departure. Earlier, under Koon, 518 U.S. 81, the very sensible rationale was that the district courts, which saw far more sentencing cases than the courts of appeals, were better positioned to determine what was exceptional, and appellate courts owed deference to that more expert determination. See id. at 96-100. The PROTECT Act has abrogated that deference. There are many policy arguments in favor of deference to the district court, which were presented to Congress by the Judicial Conference of the United States. But Congress chose to decide the balance differently, expressing concern that the departure rate for certain crimes and within certain districts threatened to undermine the Guidelines regime. See, e.g., H.R. Rep. No. 108-66, at 58-59, available at http://thomas.loc.gov/cgi-bin/cpquery/T?&report=hr066&dbname=cp108&; 149 Cong. Rec. H3059, H3066 (daily ed. April 10, 2003) (statement of Rep. Sensenbrenner).
In reviewing de novo whether any departure is permissible, the PROTECT Act and the case law require courts of appeals to consider three sources: other decisions under the Guidelines; the Commission's relevant Guidelines and statements; and the congressional purposes behind sentencing. Even before the PROTECT Act, the question of whether a discouraged factor was present in an exceptional way was determined in large part by comparison with other Guidelines cases. See Pereira, 272 F.3d at 80 (citing Koon, 518 U.S. at 98). Such other cases are not limited to cases involving convictions for the same offense. See United States v. DeMasi, 40 F.3d 1306, 1324 (1st Cir.1994). Second, appellate courts are also to consider policy statements and official commentary by the Sentencing Commission. 18 U.S.C. § 3553(b). Third, Section 401 of the PROTECT Act instructs courts of appeals to consider whether a departure is consistent with the purposes of sentencing stated in 18 U.S.C. § 3553(a)(2) — that is, retribution, deterrence, incapacitation, and rehabilitation.
As to comparisons with other reported cases, each side has some circuit authority in support of its position; the government's cases are a closer fit. The government cites United States v. Morken, 133 F.3d 628, 629-30 (8th Cir.1998) (divided court reverses a downward departure because good works are not exceptional for someone of defendant's income and preeminence in a small town); United States v. Kolbach, 38 F.3d 832, 838-39 (6th Cir.1994) (vacating a good works departure because "it is usual and ordinary, in the prosecution of similar white collar crimes involving high-ranking corporate executives ... to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts"); and United States v. Haverstat, 22 F.3d 790, 795-96 (8th Cir.1994) (vacating a departure for good works where the defendant's charitable and volunteer activities did not make him an atypical defendant in an antitrust price-fixing case).
In United States v. Bogdan, 284 F.3d 324 (1st Cir.2002), this court found no basis for a downward departure for a caring and generous father who made efforts to improve his relationship with his ex-wife and supported her financially and who was introspective and remorseful about his crime. Id. at 329-30. When the district court again granted a downward departure because it thought the sentence "unconscionable," this court again reversed. United States v. Bogdan, 302 F.3d 12, 16-17 (1st Cir.2002).
In turn, Thurston relies on several circuit decisions affirming good works downward departures. These cases are less persuasive than those cited by the government, since the circuit courts merely hold that there was no abuse of discretion and since the facts are less analogous. See United States v. Serafini, 233 F.3d 758, 775-76 (3d Cir.2000) (affirming a downward departure based on exceptional charitable works in light of the defendant's meager resources); United States v. Woods, 159 F.3d 1132, 1136-37 (8th Cir.1998) (in a bankruptcy fraud case involving a defendant who transformed the lives of two girls and cared for an elderly friend, a one-level downward departure was not an abuse of discretion); United States v. Rioux, 97 F.3d 648, 662-63 (2d Cir.1996) (no abuse of discretion to depart downward based on a combination of medical condition and civic good deeds). We would find the expertise reflected in the decisions of the district courts to be useful as well in determining whether particular good works are exceptional. But the parties have not cited any such cases.
As the government's cases indicate, corporate executives are usually better situated to make large financial contributions and are often expected, by virtue of their positions, to engage in civic and charitable activities. The ability to make large contributions should not keep a defendant out of jail. See United States v. McHan, 920 F.2d 244, 248 (4th Cir.1990). And those whose place in life does not give them similar opportunities should not be disadvantaged. See U.S.S.G. § 5H1.10.
For similar reasons, we would be reluctant to find a defendant's good works exceptional solely on the basis of actions that were required or encouraged as a condition of membership in a religious institution. Such a result — which would seemingly entitle all members in good standing to a downward departure — could undercut the principle that religion (like socio-economic status) is a forbidden basis for departure. See U.S.S.G. § 5H1.10. On the other hand, good works should not have less weight because a defendant was motivated by religious belief. Thurston should not be disadvantaged by his church involvement. It would, in any event, do a disservice to Thurston to categorize him entirely in terms of his economic or religious status. His good works predated his executive status and continued over time; they exceeded the bare requirements for church membership; and they involved costs to him in terms of time and effort.
In sum, the comparison to other case law is not dispositive and is, in any event, only one part of the analysis. We move on to the Guidelines and to the purposes of sentencing.
Two salient principles emerge from the Guidelines: the goal of parity between white collar and other criminal defendants and the goal of discouraging departures based on good works. Congress and the Sentencing Commission were clear that under the pre-Guidelines regime, sentences for white collar crimes were too lenient.20 The Sentencing Commission intended to "equalize punishments for `white collar' and `blue collar' crime." United States v. Rivera, 994 F.2d 942, 955 (1st Cir.1993) (Breyer, J.).
Viewing the departure in terms of the purposes of sentencing also militates against the departure. Thurston was convicted of a serious crime, a massive fraud at public expense involving deceit, trickery, and sophistication. The federal government spent approximately $249 billion on Medicare last year. One group has estimated that about three percent of the $1.4 trillion the country spent on health care in 2001 was lost to fraud.21 "A Sick Business," The Economist, June 28, 2003, at 64 (citing data from National Health Care Anti-Fraud Association); see National Health Care Anti-Fraud Association, Health Care Fraud, at p. 2, available at http://www.nhcaa.org/pdf/all_about_hcf.pdf (n.d.). The retribution and deterrent interests in sentencing would be significantly undercut by permitting a good works departure on this record.
"Good works" do not stand alone. They must be evaluated in the context of the crime and the purposes of sentencing. Health care fraud, a form of white collar fraud, is a serious national problem, affecting the financial integrity of programs meant to aid tens of millions of people in need of health care. Every dollar lost to fraud is a dollar that could have provided medical care to the elderly or the disabled. By definition, Medicare fraud will most likely be white collar fraud, committed by educated people with responsible jobs. Thurston's executive position at Damon, which gave him the resources to undertake many of his charitable works, also enabled him to perform the crime. Were it not for the statutory maximum, he would, under the Guidelines, have been sentenced to imprisonment for more than five years. A five-year term of imprisonment in light of the nature of the crime reflects the seriousness of the offense, the need for congruity with "blue collar" crime, and the need to deter other executives from similar law-breaking. Thurston's admirable good works simply are not so exceptional, in context, as to provide a basis to depart.
The government's argument that Thurston's conduct warranted an upward adjustment for obstruction of justice based on perjury at trial need not be resolved, given our disposition of the other issues. The statute caps his period of incarceration at sixty months. It is noteworthy, though, that Thurston's testimony on key matters of fact was contradicted by multiple witnesses.
c. Fine
The government argues that the sentencing judge erred by failing to impose a fine on Thurston in accordance with the Guidelines. Thurston argued, and the district court accepted, that he should not receive a fine because that would create an unacceptable disparity between his sentence and that of co-defendant Isola. Sentence disparity is an unacceptable basis for refusing to impose a fine and is plain error for the reasons discussed earlier.
Thurston contends that the government has forfeited its argument that a fine must be imposed by failing to object after the judge ruled. The government earlier took the position that a fine must be imposed and also argued that the court could not refuse to impose a fine on the basis of disparity — the only argument Thurston presented. In these circumstances, the issue was not forfeited. See Gallant, 306 F.3d at 1187-88 (holding that a sentencing issue was not forfeited as a result of counsel's failure to object after the court's ruling); cf. United States v. Meserve, 271 F.3d 314, 325 (1st Cir.2001) (motion to strike unnecessary to preserve evidentiary issue where party objected prior to trial court's ruling). Even were this an instance of forfeiture, the district court committed plain error in its rationale.
Before this court, Thurston attempts to defend the decision not to impose a fine on the basis that the statutory definition of his crime, which provides that a fine may be assigned, trumps the Guidelines, which provide that a fine must be assigned barring special circumstances. The crime of which Thurston was convicted, 18 U.S.C. § 371, provides for a prison term, a fine, or both. By contrast, U.S.S.G. § 5E1.2(a) says, "The court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." (emphasis added). The defendant did not establish, or even seek to establish, inability to pay. The sentencing judge made no finding, implicit or explicit, that Thurston could not pay. The PSR estimated that Thurston had a net worth of over $1.5 million, and the minimum fine under the Guidelines was $12,500.
Because the sentence fixed by U.S.S.G. § 5E1.2(a) is within the range contemplated by 18 U.S.C. § 371, the Guideline is not trumped by the statute. See United States v. Page, 84 F.3d 38, 43 (1st Cir.1996) ("There is no reason why the Guidelines may not make their own classifications within the statutes, and hence definitions which the courts must observe, so long as these are not internally inconsistent or in violation of the Constitution or a federal statute."). Here there is no inconsistency and the district court was required to impose a fine.
V. Conclusion
Thurston's conviction is affirmed. Thurston's sentence is vacated; the downward departure based on good works and purported disparity is reversed; and the order that no fine be imposed is reversed. The case is remanded for imposition of the statutory maximum sentence of sixty months in prison and for imposition of an appropriate fine. So ordered.
Notes:

1
The ferritin iron test measures the number of atoms per molecule of circulating ferritin. Ferritin is a binding protein which delivers iron to iron storage cells

2
This Act is also known as the Amber Alert bill. It includes changes put forward in the so-called Feeney Amendment

3
There was abundant evidence that Thurston instructed his subordinates to add ferritin. For example, the general manager of the Chicago lab had contemporaneous notes of a conversation with Thurston in 1988 indicating that Thurston told him to add ferritin to the LabScan. The manager of the San Francisco lab also testified that Thurston called him and told him to add the ferritin test to the LabScan

4
The defense argues that the CERs were prepared for the related purpose of justifying, to Damon executives, the purchase of equipment to carry out a higher volume of ferritin tests

5
CHAMPUS is the Civilian Health and Medical Program of the Uniformed Services, a health benefit and insurance program for dependants of military personnel that is administered by the Department of Defense

6
Damon was separately indicted for conspiracy to defraud HCFA, on the basis of the same events

7
U.S.S.G. § 2F1.1 was deleted by consolidation with U.S.S.G. § 2B1.1 effective November 1, 2001. See United States v. Gonzalez-Alvarez, 277 F.3d 73, 77 n. 3 (1st Cir.2002). Under the current Guidelines, a loss exceeding $2.5 million warrants an eighteen-level upward enhancement. U.S.S.G. § 2B1.1(b)(1). When the Guidelines in effect at the time of sentencing are more stringent than those in effect at the time of the offense, the latter are normally used, partly to avoid any hint of an ex post facto increase in penalty. United States v. Maldonado, 242 F.3d 1, 5 (1st Cir.2001) (citing United States v. Harotunian, 920 F.2d 1040, 1041-42 (1st Cir.1990))

8
By contrast, in a civil case, a defense of statute of limitations must be raised in an answer or it is lost. Fed.R.Civ.P. 8(c); In re Cumberland Farms, Inc., 284 F.3d 216, 225-27 (1st Cir.2002)

9
A defendant may waive the defense of statute of limitations by several means, including by entry of plea of guilty, see Acevedo-Ramos v. United States, 961 F.2d 305, 308 (1st Cir.1992), or by a voluntary agreement, usually written, such as in a tolling agreement, see United States v. Spector, 55 F.3d 22, 24 (1st Cir.1995). None of those situations is present here

10
Our reasoning that the argument has been forfeited would be different if compliance with the limitations period were either jurisdictional or an element of the offense which the government had the burden of proving. Here, when the limitations defense is not an issue of law but is based on facts to be proven, the defense must be raised at trial at the latest

11
For example, government witness Dr. Johnson testified that he ordered the LabScan regularly for Medicare patients; rarely needed a ferritin test; and, when he discovered that Damon charged Medicare separately for ferritin, demanded that ferritin be removed from panels he ordered. As demonstrated by a lab report the defense introduced into evidence, Dr. Johnson continued ordering the LabScan with ferritin for Medicare patients through mid-1993

12
The instruction he requested stated in part:
Mr. Thurston contends that an independent clinical laboratory does not violate any aspect of Medicare law in providing physicians with a profile or panel that contains a serum ferritin test, so long as the physician is given reliable and accurate information about the test and the choice to select the profile or panel with or without the added test.
Mr. Thurston also contends that an independent clinical laboratory does not violate any aspect of Medicare law in submitting a claim for reimbursement, using a HCFA form or otherwise, so long as the blood tests performed were ordered by a physician.
I instruct you as a matter of law that these are reasonable interpretations of the Medicare statutes, regulations and rules.
In order for you to find Mr. Thurston guilty on the basis that he caused physicians to order medically unnecessary tests for their patients, the government must prove beyond a reasonable doubt that these were not Mr. Thurston's interpretations of the pertinent Medicare laws.

13
Thurston argues it would be nonsensical to ask clinical testing laboratories to guarantee that a test ordered by a doctor was in fact medically necessary. That question simply is not raised here

14
As examples of disagreements, Thurston gives the following. The government filed objections to Thurston's requested instructions concerning character evidence and reputation (No. 7); Thurston's status as vice-president (No. 10); the definition of "knowingly" (No. 16); the definition of "willfully" (No. 17); proof of specific intent to participate (No. 18); the definition of "overt act" (No. 21); the good-faith defense (No. 22); and Thurston's reasonable interpretation of Medicare laws (No. 23). Counsel for Thurston objected to three of the government's requested instructions, each of which concerned an element of the offense: conspiracy (No. 18); unlawful objectives (No. 19); and overt acts (No. 22)

15
The court stated:
[I]n granting the motion for downward departure, I'm basing it on two grounds.
First, the downward departure is justified because of the defendant Thurston's record of charitable work and community service[, which] is unique, extensive and extraordinary. I think the record should reflect that in over fourteen years of sentencing defendants, it's my judgment that no one had a more extraordinary devotion to charitable work, community service, and especially his dedication to his church.
And the second ground is that which is set out in the United States Sentencing Commission Guidelines Manual under Chapter 1, Part A, Section 3, which is entitled ... "The Basic Approach, paren, policy statement, closed paren," setting forth the rationale of the guidelines, it's cited here that Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders.
Congress sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity.
We have a situation here where coconspirator Isola, the president of Damon and the architect, at least the prime architect of this conspiracy, received a sentence of three years' probation, and it is, in my judgment, a violation of the fundamental purpose of the Sentencing Commission Guidelines to impose a sentence which is not at least somewhat similar to that incurred by a coconspirator who was more involved in the conspiracy t[h]an this defendant.

16
Before Koon was decided in 1996, the rule in this circuit was that we would review de novo whether, "taking the reasons for departure stated by the district court at face value, those reasons will as a matter of law justify abandonment of the guidelines." United States v. Wogan, 938 F.2d 1446, 1447 (1st Cir.1991). We point this out because Thurston's fraudulent conduct took place before Koon and when this court used a de novo standard of review, as is now mandated by the PROTECT Act

17
In Thurston's case, there could be no reliance interest in any event, since this court used a de novo standard of review at the time he committed the crime

18
Good works may also be considered in setting a sentence within the Guidelines range or in setting certain conditions. This does Thurston no good, however, since the applicable Guidelines range is sixty-three to seventy-eight months, all above the statutory maximum of sixty months

19
During the trial, numerous witnesses for both sides testified to Thurston's reputation for honesty and integrity. During the sentencing phase, many of Thurston's friends and family members explicitly or implicitly said they thought the jury verdict was incorrect
Good character is covered by the aberrant behavior guidelines, and here is no claim on appeal that Thurston was entitled to a departure on those grounds.

20
See Mary Kreiner Ramirez, Just in Crime: Guiding Economic Crime Reform After the Sarbanes-Oxley Act of 2002, 34 Loy. U. Chi. L.J. 359, 372-76 (2003) (discussing the Sentencing Commission's concern that white-collar crimes have been "grossly under-sentenced"); id. at 396-401 (collecting data on the under-sentencing of white-collar crimes and arguing that the prevalence of downward departures in white collar cases threatens to undermine the integrity of the Sentencing Guidelines); see also Testimony of Sentencing Commissioner Stephen Breyer Before the Senate Committee on the Judiciary, Oct. 22, 1987, reproduced in 146 PLI/Crim 811, 824 (1987) ("[T]he Commission considers present sentencing practices, in which white collar criminals receive probation more often than other offenders who committed crimes of comparable severity, to be unfair."); 28 U.S.C. § 994(m) (2000) ("The [Sentencing] Commission shall insure that the guidelines reflect the fact that, in many cases, current sentences do not accurately reflect the seriousness of the offense."). The recent enactment of enhanced penalties for many white collar crimes only underscores Congress's disinclination towards leniency for white collar criminals. See Sarbanes-Oxley Act of 2002, Pub.L. No. 107-204, §§ 801-1107, 116 Stat. 745, 800-10

21
For other circuit court cases involving Medicare and Medicaid fraud, see United States v. Baxtonbrown-Smith, 278 F.3d 1348 (D.C. Cir.2002) (fraud exceeding two million dollars); United States v. Liss, 265 F.3d 1220 (11th Cir.2001) (kickback scheme for referrals); United States v. Regueiro, 240 F.3d 1321 (11th Cir.2001) (fraud exceeding fifteen million dollars); United States v. McClendon, 195 F.3d 598 (11th Cir.1999) (fraud exceeding three million dollars); and United States v. Polin, 194 F.3d 863 (7th Cir.1999) (Medicare kickback scheme)